Early in the morning of December 8, 1940, while semi-darkness prevailed, a Buick automobile, owned by D.L. Garner and driven by C.M. Shoemaker with the owner's permission, struck a motor cycle and seriously injured the three riders thereon, they being R.E. Lindsey, Carl S. Williams and Charles H. Mitchell. All of the named persons were soldiers stationed at Barksdale Field in Bossier Parish, Louisiana.
Both vehicles were traveling south on U.S. Highway 71. The accident occurred *Page 758 
at a point several miles south of the City of Shreveport.
A policy of insurance, written by the Gulf Insurance Company and containing the usual omnibus clause, insured the automobile against public liability and property damage.
The Gulf Insurance Company and Shoemaker, who are the defendants in this action that was brought by Lindsey to recover damages for the injury that he sustained, were condemned in solido by the district court to pay to plaintiff the sum of $4,375.
Only the insurer appealed. Plaintiff has not answered its appeal.
Appellant's principal assignments of error respecting the judgment are that the following defenses should have been sustained:
1. The automobile's driver, Shoemaker, was not guilty of negligence proximately causing the accident and the resulting injuries to plaintiff.
2. Shoemaker, being the insured under the omnibus clause of the policy, violated the cooperation clause of the insurance contract, rendering the insurance ineffective.
Anent the question of negligence, it appears that just prior to the accident the motor cycle, occupied by plaintiff and his two companions, was traveling south along the extreme west, or its right, side of the highway at the moderate speed of 20 to 25 miles per hour. Behind it was a Ford automobile and the Buick driven by Shoemaker, they following in line and in the order named and at a faster, though not excessive, speed. The Ford attempted the passing of and did pass the motor cycle. But the Buick, after being steered to the left or east side of the highway, went partially off the pavement and onto the wet and slippery shoulder, resulting in the loss of its control by the driver. Thereupon the Buick skidded and swerved to the right across the road and violently struck the motor cycle, knocking it into the west ditch.
Appellant attributes the accident to negligence on the part of the Ford's driver. It contends that Shoemaker had undertaken, was abreast of, and was in the act of passing the Ford, following the sounding of an appropriate warning signal, when the Ford suddenly veered to the left from the road's left side and forced him off the highway and onto the wet shoulder. But this position, as the trial court correctly found, is not supported by the evidence. The testimony of three disinterested witnesses, who occupied an automobile traveling a short distance behind the Buick, preponderately shows that the Ford was alongside of and passing the motor cycle when the Buick commenced its maneuver. And supporting this finding, we think, is the undisputed physical fact that the Buick, when it skidded across the highway, was in the rear of the Ford. If there had been a sudden veering to the left by the Ford while the Buick was abreast of it, as appellant contends, it seems to us that the Buick, after the skidding began, would have either gone in front of or collided with the Ford.
Shoemaker, under the mentioned circumstances, was guilty of careless and negligent driving, and his negligence alone caused the accident. He was without right to attempt the passage of the Ford while such machine was in the act of going around the motor cycle. Furthermore, nothing was done by the occupants of the motor cycle, which was proceeding in its proper traffic lane, that was in any manner a contributing cause.
The insurance policy's cooperation clause, which forms the basis of the second named defense, provides as follows:
"The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and the company shall reimburse the insured for any expense, other than loss of earnings, incurred at the company's request. * * *"
Also contained in the policy is a provision stating that no insurance coverage is in effect while the automobile is "rented under contract or leased."
Shoemaker, the Buick's driver and the insured under the policy's omnibus clause, was transferred approximately 15 days after the accident's occurrence from Barksdale Field to a gunnery camp located at Matagorda Peninsula, Texas. While there, on February 24, 1941, he was visited by P.H. Reed, an insurance adjuster employed by appellant, to whom he gave a written statement reading in part as follows:
"For the past two years I have been in the army and stationed in Panama. I was stationed at the Panama Canal Zone. On September 13, 1940, I went to Barksdale Field near Shreveport, Louisiana. While *Page 759 
at Barksdale I met D.L. Garner and on the morning of December 8, 1940, I borrowed this car from D.L. Garner to go to Shreveport, Louisiana, to see my girl friend. It was arranged between D.L. Garner and myself that I would pay for the gasoline I used on this trip and in general be responsible for the car. I had used this car several times before and in each instance I either paid D.L. Garner $5.00 cash for the use of the car for one night or I would pay him $20.00 for the use of the car for a week-end. On this morning mentioned above, December 8, 1940, I had agreed to pay D.L. Garner $5.00 for the use of his car.
"At about 7:45 A.M. on December 8, 1940, I was driving the D.L. Garner 1937 Buick Sedan and was about 4 miles from the city limits of Shreveport, Louisiana. I was near a place called the `Cotton Club' and I was driving on Highway #71. I was going about 25 miles per hour and was traveling in a southerly direction and going toward Barksdale Field. There were two cars in front of me, going in the same direction and both of these cars were going about 20 miles per hour. I honked my horn as a signal to the first car ahead of me as I was attempting to pass it. Just as I was passing him and the front end of my car was about even with the front end of this other car, this other car cut to its left in an effort to pass another car which was in front of him. When this first car swerved to its left it forced me to also turn slightly to my left. I could not turn to my left very much as there is a very deep ditch on the side of the highway. I stepped on the throttle and in some way passed both of these cars in front of me, but in doing so I lost control of the car and ran into the rear end of a motor cycle which had been traveling in front of these cars. When the front of the car I was driving struck the rear of this motor cycle we were both on the right side of the highway.
* * * * *
"As I have stated on the first page of this statement, I had agreed to pay D.L. Garner $5.00 for the use of the car Friday night, December 6, 1940, and I did pay him $5.00 cash for the use of this car Friday night. On Saturday morning, December 7, 1940, I decided that I wanted to use the car for the entire week-end so I paid D.L. Garner an additional $15.00, which combined made the total paid D.L. Garner $20.00, which is in line with our agreed price for the use of the car for the week-end. I have paid the above $20.00 to D.L. Garner."
On April 21, 1941, following his return to Barksdale Field, Shoemaker furnished to one of plaintiff's attorneys a written statement in which he said:
"On December 6th, (Friday) I rented Mr. D.L. Garner's car (Buick 8) at the rate of $5.00 per night and gave him $20.00 Friday night when I took the car for the week-end.
* * * * *
"Reed of Houston, Texas, took my statement on a typewriter. His address is 1601 Commerce Building, Houston, Texas, (Rosenbush Claim Service) I took his address because I thought I might be in Houston sometime and would see him."
Also, on that date, Garner stated in writing to the said attorney for plaintiff that:
"My name is D.L. Garner. I am attached to the 57th School Squadron. On or about Saturday, December 7th, 1940, I loaned Private Shoemaker, 88th Squadron, my Buick 8 to go out on a pleasure trip. I didn't ask him how long he would be gone. He generally came back the same day he borrowed the car. He didn't come in on this occasion until Sunday early in the morning. I found the car at the usual place Sunday A.M. when I got up. He was at the car then. He didn't use the car any more that day. He had borrowed my car a number of times before. I just let him have it as a friend. We were in the same squadron then. I gave an adjuster a statement. I told him about the same thing I am telling you. Shoemaker always stayed at the Post at night. Shoemaker never paid me anything for the car. I am sure of that."
This suit was commenced on April 28, 1941. Appellant, on May 14, 1941, filed its answer averring Shoemaker's payment of rent to Garner for the use of the automobile and that, as a consequence, the insurance was not effective under the terms of the policy when the accident occurred. Alternatively, it pleaded Shoemaker's freedom from negligence, setting forth the factual situation described in his above mentioned statement of date February 24, 1941.
Several weeks before the trial of the case, Shoemaker, in the presence of an attorney for each litigant, repudiated his two statements about his renting the automobile. At the same time he announced that Garner lent it to him as a matter of *Page 760 
courtesy, an arrangement which appellant now apparently concedes and the evidence discloses to have actually existed.
During the trial, Shoemaker testified that the accident happened substantially in the manner as found by us and above described, rather than as detailed in his written statement; and he further said that he wanted to see plaintiff recover for his injuries.
Calling attention to the contradictory positions assumed by Shoemaker, to the admitted fact that he informed plaintiff's attorneys of his original false statement concerning the renting of the car, and to his testimony expressing a desire for plaintiff's recovery of damages, appellant's counsel charge that thereby the above quoted cooperation clause of the policy has been violated. Their argument is, in part, that Shoemaker, by his actions, "prejudiced the Insurance Company, which undoubtedly could have made a reasonable settlement of this case before suit was filed had it not been misled by Shoemaker."
Counsel for plaintiff counter with the contentions:
"The defense of non-cooperation is made in bad faith;
"No breach of this clause in the policy was committed which prejudiced insurer's rights;
"The right of the injured plaintiff, in the absence of fraud or collusion, cannot be impaired or destroyed after his cause of action arose, by an act of the insured, particularly by a vicarious insured, not a party to the policy contract."
The trial judge refused to sustain the defense of non-cooperation, holding, in effect, that appellant was not entirely free from bad faith. In his written opinion, which is incorporated in the record, he observed:
"We pass now to the other defenses raised by the insurance company. The defense that the Buick was hired or rented to Shoemaker is not sustained. So far as I am concerned Shoemaker might as well have not testified. His testimony is too unreliable to have any probative value. In my opinion, the defense of failure of the insured to co-operate will not relieve the insurance company. He did not tell the company the truth about how the accident happened or about borrowing the car instead of renting it, but the company knew long before the trial date that he had not told the truth, and were not deprived of the opportunity to defend the suit. The charge that Shoemaker helped plaintiff's counsel is not made out. He only went to counsel's office after he had been sued as a defendant in this case. Of course, if he had stayed by his statement that the car was rented, and if he had been believed, the insurer would not be liable. Numerous cases have been cited on both sides with reference to failure of insured to co-operate with the insurer, but I do not consider them applicable. The law would hardly contemplate that the insured is to try to help the insurer put up a fictitious defense. All he ought to be required to do is to tell the truth. Of course, in this case Shoemaker did not tell the truth, but if he had told the truth, it would not have changed the company's liability. Of course, the company claims that because Shoemaker lied to it, that it was deprived of the opportunity of making a settlement with the plaintiff, but I believe the company knew in plenty of time that Shoemaker had not told the truth, to have made any efforts it wanted to, to get the case settled."
It is the well settled law that a defense on the ground of the insured's violation of the policy's cooperation clause is an affirmative one, and the burden of establishing it is with the insurer. 72 A.L.R. page 1453, 98 A.L.R. page 1468. Also, the question of whether or not there has been a failure to cooperate is usually one of fact. 72 A.L.R. page 1454, 98 A.L.R. page 1469.
Furthermore, it has been held that such clause has for its purpose the protection of the insurance company against the risk of collusion between the insured and persons claiming damages for alleged torts. 5 American Jurisprudence verbo Automobiles Section 545. But "cooperation by the insured is excused if improperly demanded by the insurer, and does not include assistance in a sham defense by the insurer; nor can the insured be required to testify falsely, or favorably to the interest of the insurer." 29 American Jurisprudence verbo Insurance Section 789. See, also, 72 A.L.R. page 1453 and 98 A.L.R. page 1470.
Considering these legal principles and the circumstances hereinafter pointed out, we cannot say that the trial court manifestly erred in holding that the insurer was not altogether in good faith and in rendering judgment in favor of plaintiff. This conclusion makes unnecessary our considering the other above stated contentions of plaintiff. *Page 761 
The evidence is convincing that there was no collusion whatever between Shoemaker and the plaintiff Lindsey. Although both were stationed at Barksdale Field, they were in different squadrons and unacquainted with each other; and at no time, either before or after the accident, did they converse together.
It is testified by Shoemaker that a few days after the accident he and some other soldiers at Barksdale Field were talking about the insurance on the Buick and they advised him that "if you state that you did not rent the car Lindsey will not be able to get anything"; and that by reason of this advice he gave the false written statement about paying rent for the machine. We seriously doubt that he was so advised. None of his informants was called to testify in the case. But granting that he was, it seems unreasonable, if he really wished to aid plaintiff, that he would have relied and acted upon the curbstone opinion thus given. He could have very easily obtained the policy from his friend and the car's owner, Garner, who possessed it at Barksdale Field, and ascertained therefrom the correct conditions for plaintiff's recovery.
Also militating against the good faith position of the insurer is the admitted fact that when its answer was filed it possessed the written statement of Garner reciting that Shoemaker had paid him no rent for the car; yet it answered and pleaded that rental was paid, the allegations in this regard being predicated on the information contained in the written statement given by Shoemaker to the adjuster Reed on February 24, 1941, at Matagorda Peninsula, Texas. According to Shoemaker, it is observed, this adjuster promised to show him a good time when he came to Houston. Furthermore, Reed was not called as a witness at the trial; neither was his testimony offered in deposition form.
And strongly supporting the holding of the trial judge is the circumstance that in March, 1941, more than a month before the answer's filing, the insurer settled with plaintiff's companions on the motor cycle for the damages that they sustained in the accident. Mitchell was paid $325, while Williams received the sum of $335. Obviously these substantial settlements were negotiated only after the insurer was satisfied that Shoemaker's negligence proximately caused the accident and that he had paid nothing for the use of the offending machine. If it had believed otherwise, certainly those claims would have been disputed and contested.
Appellant questions the quantum of $4,375 fixed by the district court. Its counsel contend that an award of around $2,000 would be ample. Then they say:
"In any event, the judgment may not exceed $4340.00, and apparently this was conceded by plaintiff in his brief, as he did not argue otherwise. This is true for the reason that the policy referred to in this case has a maximum limit of $5000.00 for any one accident, irrespective of how many persons might be injured in the accident, and in this case there were three persons injured, including the plaintiff, and a total sum of $660.00 has been paid to date to the other two injured parties, which must be deducted from the total of $5000.00 allowed in the policy for all accidents, leaving a net amount available in this case of $4340.00 and, as stated, this is the maximum amount that a judgment could be rendered against the Insurance Company."
The policy stipulates a limit of liability for bodily injury in each accident of $5000. Also it provides a maximum coverage on property damage of $500. According to the evidence, there was paid for bodily injury to Williams the sum of $300 and to Mitchell $325, a total of $625. Deducting this from the $5,000 bodily injury insurance there remains available the sum of $4,375, rather than the $4,340 as contended by defense counsel. The additional $35 paid to Williams was for the harm experienced by his motor cycle, and it was cared for by the property damage insurance under the policy.
The evidence justifies the award made to plaintiff. He sustained a compound fracture of the left leg, involving both the tibia and fibula, a little lower than midway between the knee and ankle joints. The injury resulted in a destruction of some of the bone at the site of fracture, leaving a gap between the broken ends. Excruciating pain endured for a long period of time. When the trial was held, almost six months after the accident, plaintiff was still hospitalized, and it was thought that he would require hospital care for from eight to twelve months longer. Furthermore, it appeared that some permanent disability would result from his injury.
The judgment, for the reasons above given, is affirmed.
DREW and TALIAFERRO, JJ., concur.
 *Page 79