[Civ. No. 16853. Second Dist., Div. One. Sept. 19, 1949.]

WILLIE JAMES POWELL, Appellant, v. PACIFIC NAVAL AIR BASE CONTRACTORS (a Corporation) et al., Defendants; THE VENTURA COUNTY RAILWAY COMPANY, Respondent.

Sampson & Dryden and DeWitt Morgan Manning for Appellant.

O'Melveny & Myers, Lauren M. Wright and Rodney K. Potter for Respondent.

DRAPEAU, J.— Plaintiff was a slingman at the Pacific Naval Air Base at Port Hueneme, California. On April 14, 1945 working with a crane, he and another slingman were loading a type of freight car called a gondola. The gondola was 40 feet long, about 9 feet wide, and was equipped with steel endgates, hinged at the bottom. These endgates, as the name suggests, were at each end of the car. They were secured by locking bars and hooks fastened at the top to the bulkhead of the car. The locking bars and hooks were designed to keep the endgates from falling into the car when it was not loaded.

The crane would lift a heavy crate of masonite from the ground, swing it over and set it in place in the car. The plaintiff was working on the floor of the gondola. His duty was to guide the crates into places close to each other as they were lowered, and to take the crane slings off. The other slingman worked on top of the crates as they were dropped into the gondola. The crates were loaded from south to north.

As the crates were set in place, the plaintiff facing south, gradually backed northward. When he reached a point a few feet south of the north end of the car, with his back to the endgate, without any warning it fell in upon him. It struck him in the back of the legs about the height of his knees and felled him to the floor of the gondola. It took the combined efforts of three men to lift the endgate, to drag the plaintiff from where he lay under it.

After the accident it was found that one of the locking bars was rusty and broken, and apparently the endgate had been held in place by rusty wire, about three times the size of baling wire. The boss loader at the base testified that he looked into the gondola before it was loaded and that the endgate leaned inward about 12 inches.

The plaintiff was taken to a hospital. It was determined that he had sustained a compound fracture in the lower third of his right leg, with both bones badly crushed, and that the muscles of the leg were shattered probably beyond recovery. He spent weeks in that hospital, then he was discharged with his leg in a plaster cast. No union of the broken bone ensued and he was thereafter hospitalized and operated upon twice, with no better success. His physician testified that in his opinion the plaintiff would never again be able to bear any weight upon his right leg. So here we have an unfortunate man, 6 feet 3 inches in height, who weighed 277 pounds, three weeks out of the service in the second world war, crippled for life.

Plaintiff complains, with one count for negligence, and two counts under the provisions of the Federal Employers' Liability Act. (35 Stats. 65, 45 U.S.C.A. § 51 et seq.) Defendants named were certain individual trainmen, all of the railroads which handled the gondola on its trip to the naval base, and the contractors at the base. The individuals, being nominal defendants, need no further consideration. The connection of the other defendants with the case will develop with a recital of the movements of the car prior to the accident.

The gondola, Pennsylvania No. 344785, was the property of the Pennsylvania Railroad Company. It came to California, loaded with portable building sections. It was delivered in Los Angeles to Southern Pacific Company by the Santa Fe, April 11, 1945. From Los Angeles it was hauled by Southern Pacific to Oxnard, California, and there delivered to Ventura County Railway Company, in the early morning of April 12, 1945.

Ventura County Railway Company owns 3½ miles of track from Oxnard to the naval base, and one-half mile of track inside the base. This short-line railroad hauled the car from Oxnard to the base on the same morning, and there delivered it to Contractors, Pacific Naval Air Base. It was unloaded and then reloaded on the same day by the Contractors. The plaintiff was employed by the Contractors.

Shortly after the beginning of the second world war, the

United States Navy established a forwarding base at Port Hueneme, California. The location was a desolate stretch of sand dunes and farm land near the old town of Hueneme, lying for several miles along the Pacific Ocean. Before the end of the war it was transformed into a great storing and forwarding depot. Thousands of men and women were employed. Thousands of carloads of war material were loaded and unloaded every month, and at times several ships were unloaded and loaded every day.

Owing to the exigencies of war times, the Navy contracted with several American corporations to build the base and do the work. The Navy owned the yard and the facilities.

These corporations by agreement effected a combination like that of Six Companies in the building of Hoover Dam. The agreement was represented by a contract between the corporations as joint venturers, and they named themselves: "Contractors, Pacific Naval Air Bases." This concern will be referred to hereunder as "Contractors."

Pennsylvania Railroad Company went out of the case on an order quashing the summons, for the asserted reason that it could not under the provisions of the Federal Employers' Liability Act be made a defendant.

Judgment for nonsuit as to Southern Pacific and the Contractors was granted in a previous trial. The record does not show why nonsuit was granted in the first trial as to these two defendants. It may be assumed that perhaps it was for the reason that Contractors were consignees and shippers and not the delivering railroad carrier. In Contractors' answer it is alleged that the plaintiff was covered by and being taken care of by California workmen's compensation. And it may be assumed that perhaps Southern Pacific went out of the case because it was an intermediate, not a delivering carrier.

In any event, the only defendant left in the second trial was Ventura County Railway Company.

The issues were submitted to a jury, and verdict rendered for the plaintiff for $50,000.

Upon motion duly made, the trial court rendered judgment for the defendant notwithstanding the verdict.

Plaintiff appeals, and as grounds for reversal of the judgment urges that there was substantial evidence of negligence of Ventura County Railway Company; that from the testimony it may be fairly inferred that that company negligently furnished a defective car to plaintiff's employer, violating a duty owed by it to plaintiff.

It is respondent's position that there was no duty of care on the part of Ventura County Railway, because it was merely an intermediate carrier; and that, in any event, there is no evidence of negligence of said defendant. .

█ Defendant's position that it was an intermediate carrier only must be based upon the assumption that Contractors operated a railroad as a common carrier. For the delivering carrier owes to consignees and to shippers, and to their employees, the duty of inspection of cars furnished, to determine whether such cars are safe to load and unload, and the duty to give to consignees and shippers warning of defective conditions in cars, discoverable by such inspection. █ On the other hand, an intermediate carrier owes no duty of inspection to either the consignee or the shipper, or to their employees. (44 Am.Jur. § 434, p. 655 et seq.)

█ In support of defendant's contention that the Contractors operated a railroad and were the delivering carrier, the following is quoted from defendant's brief: (The facts stated are supported by the record.)

"The evidence is clear and uncontradicted that there were 35 miles of railroad tracks within the naval base, that the operations of engines and cars upon these tracks, with exception of a single line into the exchange tracks, was limited to Pacific Naval Air Base Contractors Railway Department, which, using engines and tracks owned by the Navy, was in complete charge of all railroad equipment on the base until its return to the interchange tracks.

"Complete trains of cars were left on this interchange track and from that point until the cars involved were ultimately reassembled on said track as other complete trains they were entirely under the control of the Pacific Naval Air Base Contractors. In the interim the trains were broken up by the Pacific Naval Air Base Contractors Railway Department, the individual cars moved to some locality on the many miles of track within the naval base and there unloaded by the Pool Department of Pacific Naval Air Base Contractors; thereupon they were either returned to the exchange track empty or if selected by the 'car department' of the Pacific Naval Air Base Contractors Railway Department for reloading were taken as necessary to some other locality where the Pool Department reloaded them before they were reassembled in new trains on the exchange track. The function of the Railway Department in this operation was described by Mr. Hathaway,

who was in charge thereof as 'the Pacific Naval Air Base Railway.' The witness in charge of entire operations for Pacific Naval Air Base Contractors, referred to this phase of operations as 'the railroad department' or 'the railroad section'. Mr. Hathaway further testified that the Pacific Naval Air Base Railway even operated engines outside of the navy base as far as the juncture of appellee's line with that of the Southern Pacific Company at Oxnard making use in so doing of appellee's track.

"It is apparent, moreover, that Pacific Naval Air Base Contractors Railway Department conducted itself as a railway in its relations with other railroads. As appears by the testimony of Mr. Hathaway it was a member of the American Association of Railroads. (Though appellant objected to the materiality of this testimony, it was never stricken from the records.) Moreover, Pacific Naval Air Base Railway exercised the privilege of confiscating cars for reloading purposes, of which privilege Mr. Duncan, witness for plaintiff, stated: 'It is generally accepted between all the railroads'.

"The Pacific Naval Air Base Railway was the only organization permitted to operate a railway upon the 35 odd miles of track within the confines of the naval base. In connection with this operation it established a car repair shop for the maintenance of railway cars handled by it."

But, giving to the evidence all the probative value as stated and argued in defendant's brief, there is another inference which can be drawn. That inference is that the Contractors were consignees and shippers and nothing more. As such consignee-shippers the Ventura County Railway Company was the delivering carrier, and owed to Contractors and to their employees the duty of furnishing a car in which it was safe for men to work.

The railroad on the naval base hauled no freight except the Navy's. It was not for public use. It was devoted to one purpose only, that of receiving war material, assembling, storing, and reshipping the same. While the operation was Gargantuan in scope, in principle it was no more than that of a warehouseman who maintains his own private spur track and his own trackage on his own premises, and pulls freight cars there spotted by the railroad around with a tractor, or, lacking that motive power, moves them with a pinch bar.

■ A logging railroad, with all of its incidents, is not a common carrier as distinguished from a shipper or consignee. (*E. E. Taenzer & Co.* v. *Chicago R. I. & P. R. Co.,* 170 F.

240 [95 C.C.A. 436].) The same rule applies to an interplant railroad in a steel mill (*Cooperative Leg. Com.* v. *Public Utilities Com.* (1948), 149 Ohio St. 511 [80 N.E.2d 159].)

With reference to defendant's contention that there was no substantial evidence of negligence on its part, the record shows that Ventura County Railway made no inspection of the car at all; they just took it over from Southern Pacific after an inspector for that company had looked over it in a perfunctory way. Something more than this is required of a delivering carrier which furnishes freight cars for men to work in. The evidence as to negligence was sufficient to require judgment in conformity with the verdict.

It is well-settled law that if there is any fair inference to be drawn from substantial evidence to support the verdict of a jury, the granting of a judgment notwithstanding the verdict is error. (*Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108 [291 P. 184]; *Estate of Caspar*, 172 Cal. 147 [155 P. 631].)

The judgment is reversed, and the superior court directed to make and enter judgment for the plaintiff for $50,000.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied October 7, 1949, and respondent's petition for a hearing by the Supreme Court was denied November 17, 1949. Traynor, J., and Schauer, J., voted for a hearing.