DAVIS et al. v. ST. LOUIS SOUTHWEST-
ERN RY. CO.

Civ. A. 3116.

United States District Court
W. D. Louisiana, Shreveport Division.

Aug. 2, 1952.

See also, D.C., 99 F.Supp. 751.

Reuben W. Egan, Shreveport, La., Jackson, Mayer & Kennedy, Shreveport, La., Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., for plaintiff.

John M. Madison, Wilkinson, Lewis & Wilkinson, Shreveport, La., for defendant.

DAWKINS, Chief Judge.

Plaintiff, as the lawful tutrix of her minor son, Hoover Davis (called Hoover), sues for damages claimed to have been caused to him by the alleged negligence of the defendant. The case was tried to the court without a jury.

Big Rock Stone & Material Company (called Big Rock), of Little Rock, Arkansas, has its plant on or adjacent to the tracks of the Missouri Pacific Railroad Company (called Missouri Pacific), and on or about November 11, 1949, had the latter to spot a number of empty gondola cars there to be loaded with stone or rocks weighing from twenty-five to one hundred twenty-five pounds, to be shipped to various consignees. Among cars so spotted was one bearing No. PLE2071, belonging to the the Pennsylvania Railroad, for shipping to Markham-Brown and L. L. Sanders (called Markham-Brown), at Fordel, near Bossier City, Louisiana. The rocks were to be used as riff raff on a river bank. After the car was loaded, Missouri Pacific switched and delivered it to defendant, St. Louis South-

western Railway Company (called South-western), on the latter's exchange track some five miles from the plant. Southwestern issued its own bill of lading on a through rate and paid to Missouri Pacific $11.22 as switching charges.

Southwestern inspected the car on delivery to it, and again at Bossier City before delivery to Markham-Brown at Fordel, where it was unloaded by a number of colored laborers, among them plaintiff's son, Hoover. When the unloading was about finished, the laborers began leaving the car. According to Hoover, he was among the last to leave and was climbing over the end-gate, at the corner where it joined the side, to go down a ladder on that side when the gate fell with him and crushed his right leg, the gate weighing several hundred pounds. This ladder was also the means by which he had climbed into the car to help unload it. However, the foreman in charge of the crew testified that he was looking at Hoover when the accident happened and the latter was standing on the floor when the gate fell and struck his leg. In any event, he was taken to a hospital in the City of Shreveport, where it was found that the lower third of the right tibia was crushed or fractured into several pieces and some of it was protruding through the skin on the inside of his leg. The necessary operation was done by an experienced orthopedic surgeon, who, after cleaning out the wound, put a plate against the bones with screws to hold them in place and supported the whole with a plaster cast. There were several fragments of the bone and the operation required approximately two hours, under a general anesthetic. Hoover remained in the hospital from ten days to two weeks and was then sent home where he remained in bed another ten days or two weeks. Thereafter, he was placed in a wheel chair, and the cast extending from the groin to the toes remained in place about four months. After it was removed, he was provided with a brace so constructed that only about 20% of his weight was upon the leg, and which permitted him to move about.

The accident happened and the first operation was performed on November 15, 1949. He continued to wear the brace from the time it was provided until September 21, 1950, when a second operation was performed. With respect to the latter, the surgeon who performed both it and the first operation, testified as follows:

"We opened his right leg, took the plate and the screws out, freshened up the fracture surface and cut it back to give it good solid surface to stand on and then went into his opposite leg— his left leg—his good leg—and with an electric motor saw, cut out a large bone graft which was then placed across the fracture in his right leg and held 'in position with screws. We also dug out the softer type of bone of the left leg and packed it about the fracture in an effort to encourage healing. And then both legs were placed in long leg plaster casts."

This operation took about three hours. The patient remained in the hospital a little longer "and he went through about the same routine of plaster for approximately four or five months followed by a brace again". This doctor saw the patient for the last time in connection with this second operation in December, 1950. However, he saw X-Ray pictures thereafter taken at the Charity Hospital.

"They revealed that for quite a while, for many, many months, he looked fairly good. At least, he was holding his own, but then the graft began to bow and it was established there was definite non-union again, that is, failure to unite.

\* \* \* \* \* \*

"A. \* \* \* I saw him then in the office on October 31st, 1951 at which time definite non-union was established with failure of the bone graft.

"Q. \* \* \* A. This is the most common site of non-unions in the body and it is generally attributed to the fact that here the bone is quite dense and hard and its blood supply is poor and it has about the highest incidence of failure to unite than of any other fracture that we see. In addition, this boy had a compound wound and soft tissue damage—damage to skin and

muscles. That also impairs the ability to heal. Scientifically—truly, we don't know the exact cause of non-union. We do know it is very common in certain locations because of blood supply and non-union will occur if you fail to get a good reduction or if you fail to hold on to it. In his particular case we got a good reduction and we held on to it with all the steel and screws we could put in and he still did not unite.

"Q. Unless there is union, Doctor, there could be no use of that leg for working and walking purposes? A. He can walk with minor discomfort in a brace.

"Q. Do you say he could do hard manual labor? A. No, sir.

"Q. Could he do any sort of manual labor that would require him standing on his legs and exerting strength? A. No, sir.

"Q. On October 31st, 1951, when you made the examination in your office—A. Yes, sir.

"Q. You say again it was determined definitely there was no union? A. That is right, sir.

"Q. What did you do, or did you say then, could be done, if anything? A. You would have a choice of again trying massive bone grafting procedures, or allowing the patient to remain as a brace patient.

"Q. If he remained as a brace patient, would he remain so the rest of his life? A. Yes, sir.

"Q. If you tried these other kinds of operations, what assurance, if any, would you have that they would succeed? A. Statistically there are no adequately published results on this type of procedure. The complications are pretty high and the rate of success is certainly not better than fifty percent.

"Q. Would the fact that the union had not taken place in this boy despite two prior operations make the outlook pessimistic? A. Yes, sir.

"Q. Would or would not such additional treatment be expensive? A. It would be quite expensive.

"Q. Would you estimate how much his doctors bills alone would be? A. His total cost would be somewhere between $750 and a thousand.

"Q. Does that include hospitalization? A. Yes, sir.

"Q. Then if that did not succeed, what could be done? A. It would be very difficult to say. He would either remain as a brace patient and choose to remain as a brace patient or be amputated and wear and prosthesis.

"Q. What is that, sir? A. An artificial limb."

Both this surgeon and another, appearing as a witness for defendant, thought a third operation was worth trying, as to which the chances were about fifty percent, but if this was not done, the leg should be amputated below the knee and the patient provided with an artificial limb. This, however, would involve a serious handicap, according to the doctors, for one dependent upon his manual labor for a living. Hoover had no education or training for anything else and could barely write his name.

### Findings of Fact Affecting Liability

The car was furnished by Missouri Pacific to Big Rock, who loaded it, and it was then switched to the exchange track by the same railroad, where it was delivered to Southwestern. The type of inspection, both there and at Bossier City, was to ascertain if there were any "penalty" defects such as are covered by the Safety Appliance Laws. No inspection of the fasteners or latches on the end-gates, including the one which fell, was made except to see that it was in upright position. Of course, as long as the rock remained against the gate, it could not fall whether the latches or bolts were engaged or not.

This was the first time Hoover had worked on this type of car and he knew nothing about its operation or any danger from the gate falling.

A great deal of controversy arose over whether the "A" or "B" end of the gondola, PLE2071, caused the injury, but the court is of the view that this made no difference because the fact remains that Hoover was seriously injured, and that it was caused by the particular door which fell. Defendant attempted to pin plaintiff down in the allegations of the complaint to a particular end according to those designations. Plaintiff insisted it was the "A" end while defendant contended it was "B" end, and at the same time tried to exclude any evidence as to the condition of the latter, counsel appearing at the taking of depositions of defendant's employees on discovery and instructing them not to answer any questions about the "B" end of the car. It is not believed that plaintiff was bound to select either end; there was no question about the accident, defendant took possession of the car shortly thereafter and there was no doubt the door which injured Hoover remained down. There could be no prejudice to defendant in proving what happened even if the particular end involved was not identified, so long as the defects in the one which fell on Hoover were proven. Especially was it unnecessary to allege these details under the Federal Rules of Civil Procedure, 28 U.S.C.A. Nevertheless, it remains that the door fell because the latches or bolts were not fastened or in place, and one of them was broken, according to defendant's own inspector.

■ The question of law is as to who was responsible for the condition which caused Hoover's injury. In the first place, as stated earlier, the shipment was made on a bill of lading issued by this defendant, which made it both the initial and delivering carrier, insofar as the interstate journey was concerned. See Houston E. & W. T. Ry. Co. v. Houston Packing Co., Tex. Civ.App., 221 S.W. 316. There were no intervening ones. At the same time, the Missouri Pacific furnished the car and had the best opportunity to determine its condition while thus unloaded, and was under a high duty to see that it was in condition to reasonably serve the purpose for which it was intended, particularly in view of its proximity to and knowledge of the business of Big Rock. The shipper, it would seem, also bore some responsibility to discover defects such as that proven here, because it can scarcely be said that it did not know that people would be working on the inside when unloading, and that it was possible, if not probable, that someone might be injured as happened by the falling door. If the condition was discovered before loading, it was the shipper's right to either reject the car or to in some way provide warning and notice to protect those such as plaintiff and his employer. The evidence preponderates in favor of the conclusion that not only was one of the latches broken and the other unfastened, but the door itself was sprung so that the other latch could not, by ordinary means, be engaged.

■ Plaintiff's employer also had some responsibility in this matter. Presumably it had had prior experience with unloading rock from gondolas, a minor portion of which have these inwardly collapsing gates. The duty to make reasonable efforts to see that these gates were firmly closed, rested upon this employer, who had the job of unloading the cars. However, since the adoption of humane compensation laws, employers have had less tendency to carefully discharge those obligations and to let the compensation insurer wrestle with the results. Then, too, recent State Legislation, which permits the suing of third persons or their insurers for large sums of money, largely in the Federal Courts where they can have a jury, has, it is believed, also weakened the vigilance of such employers. The contrast between the nature of inspections by such employees and railroads, where the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. requires the proving of negligence and full recovery, is shown in this case itself, in that the inspectors looked mainly for "penalty" defects or violations of Safety Appliance Laws, while being less concerned with those which carry potential danger to persons such as this plaintiff.

Notwithstanding the evidence to the point that the character of the inspections made by the Railroad in this case is prac-

ticed by others, the very condition was so inherently dangerous that defendant was bound to do something more. Its inspectors were bound to recognize the presence of these gondola cars with collapsible gates, and it required very little further effort to see that the means provided and intended to hold them in place would perform that function. Folsom v. Lowden, 157 Kan. 328, 139 P.2d 822; Erie R. Co. v. Murphy, 6 Cir., 108 F.2d 817, 126 A.L.R. 1093; Powell v. Pacific Naval Air Base Contractors, Cal.App.1949, 209 P.2d 631. Here that was not done and the circumstances preponderate in favor of the conclusion not only that the defect existed when the car was placed for unloading, but that it was present at the time it was delivered to the shipper, that is, one of the latches was broken and that the other, if fastened, received a blow jarring it loose when these heavy stones or rocks fell against the gate when loading. In any event, the evidence supports the belief that there was no fastening holding the gate in place when the car was spotted for unloading, but that it was held erect by the weight of the rocks against it. It was, at least, in such condition that very slight pressure caused it to fall, which would not have happened had even one of the latches been properly fastened.

My finding is that the concurrent negligence of the shipper, the employer and the defendant, was responsible for and proximately caused the accident and if either had done their duty by proper inspection or warning, it would not have happened.

I am also of the view that there is no proof to support the issue that this ignorant, inexperienced youth was guilty of any negligence.

## Quantum

With due respect to the Court of Appeals for this Circuit, and bowing to its views as expressed in Gillen v. Phœnix Indemnity Co., 5 Cir., 198 F.2d 147, where juries are involved, I am still unconvinced that the decisions of the State Courts on the question of quantum in these damage suits are not relevant, but believe they constitute a part of the law to be applied just the same as Article 2315 of the Louisiana Statutes Annotated—Civil Code, which creates the cause of action. That court, in the Gillen case, said:

"The guide which the judges of Louisiana Courts employ is, in effect, the means which they have adopted for determining the fact of quantum. It must be conceded that their adherence to former cases as 'guides' as a means of enforcement of uniformity *is a matter of law*. Nevertheless, quantum is recognized as a question of fact. In the State Courts both of these questions, law and fact, are determined by the judges, who are experienced and able to discriminate and make allowance for factual differentiation. Such procedure, or method of judgment, can not be employed in instructing the jury without violating the well recognized principle *which forbids the judge to suggest the proper amount of award.*" (Emphasis by the writer.)

It is thus seen that the Court of Appeals concedes quantum to be "a matter of law", at least in part, yet it holds that the trial judge, mainly because of the assumed inability of the jury to understand, must omit that law of the State which is applied by its own courts " 'to maintain some standard of uniformity'." Of course, that part of the above quotation which is underscored at the end is correct only in the sense that the judge cannot tell the jury, *as a matter of law,* what amount to award, but it has been the settled law of the Federal Courts from the beginning that the judge can discuss and refer to the facts, provided he tells the jury they are not bound by his views. I still believe the judge of this court is entitled, as a matter of law, after telling the jury that they are the sole and exclusive judges of the facts, credibility of witnesses, and the weight of the evidence, to analyze that evidence and to give them the law to be applied according to the facts as they find them. I have never understood it to be a transgression to instruct them that if they find a certain state of facts, a pertinent rule of law should be applied, and in these cases, it can

be only the law of the State. Because of the fact that no two cases are exactly the same, no absolute measure can be set by any decision, and as the quoted charge in the Gillen case shows, they were so instructed; but they were further advised that excessiveness or inadequacy are questions of law to be determined by the judge, even in the Federal Courts. See Southern Pacific Co. v. Guthrie, 9 Cir., 186 F.2d 926, both the main and dissenting opinions, particularly one of the latter by Chief Judge Stevens, and the wealth of authorities cited by each.

In Capital Traction Co. v. Hof, 174 U.S. 1, 19 S.Ct. 58a, 585, 43 L.Ed. 873, it is said:

" 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of 12 men before an officer vested with authority to cause them to be summoned and impanelled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of 12 men, in the presence and under the superintendence of a judge empowered to instruct them on the law *and to advise them on the facts,* and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion. Yet there are unequivocal statements of it to be found in the books.

"Lord Hale, in his History of the Common Law, (chapter 12), 'touching trial by jury,' says: 'Another excellency of this trial is this: that the judge is always present at the time of the evidence given in it. Herein he is able, in matters of law emerging upon the evidence, to direct them; and also, in matters of fact, to give them great light and assistance, by his weighing the evidence before them, and observing where the question and knot of the business lies; and by showing them his opinion even in matter of fact, which is a great advantage and light to laymen. And thus, as the jury assists the judge in determining the matter of fact, so the judge assists the jury in determining points of law, and also very much in investigating and enlightening the matter of fact whereof the jury are the judges.' And again, in summing up the advantages of trial by jury, he says: 'It has the advantage of the judge's observation, attention, and assistance, in point of law by way of decision, and in point of fact by way of direction to the jury.' 2 Hale, [Hist.] Com.Law · (5th Ed.) 147, 156. See, also, 1 Hale P.C. 33."

It is difficult to see how the judge may "advise them" (the jury) on the subject of quantum, either as to the facts or the law, without mentioning the number of dollars found by the State Courts as sufficient to compensate for a similar type of injury, and if they find the injury in the case at hand to be of the same general nature, then the State Court's decisions should be used as guides in determining the amount to be awarded. If he cannot do this, then they have no guide and are left entirely to guess or speculate with respect to the most important issue in the case, which concededly is governed by the law of the State.

In the present case, the court, by choice of the parties, must perform the duties both of the judge and jury. It is believed that in doing so, he is able to apply the law of the State to the facts as he finds them. Taking note of the Court of Appeals' reference in the Gillen case to the views of the late Judge Lee and Judge Borah, unfortunately the final views of Judge Lee, as expressed to the writer on this subject, were never officially placed of record because of his untimely death. However, it is believed that the statement of the law that where a Federal Court sits, it is only another tribunal of the State, with equal powers and duties in the administration of its laws, is made clear in the case of Guaranty Trust Co. v. York, 326 U.S. 99, at page 109, 65 S.Ct. 1464, 1470, 89

554

L.Ed. 2079, from which the following is quoted:

"In essence, the intent of that decision (Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188) was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies Erie R. Co. v. Tompkins is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away, should not lead to a substantially different result."

It is true that trial by jury is fundamental under both the Federal and State systems, but in the Federal Courts, the judge is allowed to aid the jury in reaching a fair and just conclusion, both on the facts and the law, as the basic purpose of all judicial tribunals. Anyone who has sat as a trial judge knows how difficult it is, in a complicated case, to get over to the jury the principles of law involved without some reference to the issues of fact in concrete form. While it is correct to say, in both systems, that the judge can prevent a flagrant miscarriage of justice by granting a new trial, or requiring a remittitur when excessive, nevertheless, it seems to me to be clearly contemplated that this should not be done on slight considerations, but that it is far preferable, in maintaining the jury system of administering justice, that he should instruct the jury in the manner best calculated to induce a just conclusion of its own in the first instance. Of course, he cannot require an increase as an alternative to a new trial. Certainly an inadequate award is as injurious to the plaintiff as an excessive one for the defendant.

In the days when the modes of life and the relations of the people were simple, it was not so difficult to present to a body of laymen, many of them serving for the first time, the questions requiring their decision. It is my experience, after many years, that in the vast majority of instances those who compose juries have a sincere desire to perform their duties honestly and correctly; but in the present complicated condition of our economy, there is much greater difficulty in getting over to them squarely and understandingly just what that duty is. Congress has recognized this situation in numerous instances by denying juries in cases where the Government's rights were concerned. The most recent illustration is the Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., by which otherwise the United States places itself in substantially the same situation as all other litigants, when its agents are guilty of negligence injuring someone else, but provides for trial by the judge without a jury. In equity cases, a more exact application of justice is assured by the training of the judge who decides both fact and law. Is it not to be desired that every lawful aid should be given to inexperienced laymen to enable them to do justice also to their fellowman?

It is hardly necessary to call attention to the tendency, multiplied enormously within the past twenty years, to delegate to Boards, Commissions, etc., the judicial power to decide fundamental questions, both of law and fact, involving a large part of the economic life of the nation and millions of dollars, without the intervention of a jury. The arguments which have been made in support of that system are that they deal with matters involving expert judgment, which those semijudicial bodies are better qualified to handle than even the court, to say nothing of a jury. In many of those determinations, unless there is an error of law, the courts are helpless to interfere, although the oral testimony is heard and the witnesses seen only by a single examiner. It may, according to court standards, even preponderate in opposition to the conclusions reached, but if there be substantial evidence to support it, the finding of facts must stand. The Board simply reviews the cold record after it has been made before the examiner. I am greatly imbued with the idea that the courts should not abdicate their powers or shirk their responsibilities in trying to see that justice is done by some fixed standard rather than

to put litigants, any more than can be avoided, in a position of gambling upon what untrained minds may do. As I have said in other cases, the great volume of damage suits being brought by citizens of Louisiana in the Federal Courts of this State has only one purpose, that is, to get away from the judgments of their own tribunals in the hope of inducing juries to award them much larger sums than they are now able to get in the State Courts. This I believe to be wrong and a sound reason for using every lawful means at the command of the Federal Courts to prevent a frustration of even-handed justice between the citizens of Louisiana and those of other states. See address of Robert B. Troutman before the Fifth Circuit Conference on June 30, 1952. It would serve no useful purpose to refer to the substantial differences between recoveries for the same injuries in the State Courts and the findings of juries in the Federal Courts of Louisiana; or even the difference in those cases presided over by my associate and by me where I have instructed juries as to the law of Louisiana on the question of quantum. It is my sincere belief that the remedy of those who feel aggrieved at the inadequacy of the judgments of the State Courts is through proper efforts to induce those tribunals to adopt greater liberality than they have appeared willing to do.

■ Having found liability, the injured youth is entitled to be paid such sum as will compensate him for the damages suffered insofar as money can take the place of the things of which he has been deprived. At the time of his injury, Hoover was eighteen years old and earning approximately $35 per week, but this had been for a short while only, as immediately prior thereto he had been earning $30 or less per week as a common laborer. He had a life expectancy of approximately 42 years, according to the American Table of Mortality Experience, adopted by statute in this State. Unless a third operation proves successful, which the first two did not, Hoover will be confronted with the necessity of wearing a brace, using crutches, or having his leg and foot amputated below the knee, which would permit him to wear an artificial limb, for the rest of his life, with the inevitable consequences which flow from that condition. The professional opinions of the orthopedic surgeons are to the effect that another operation, including bone grafting taken from other parts of his body, would have a fifty percent possibility of restoring his leg to usefulness; but, in view of the two failures, the expense, pain and suffering which he would endure, with the ever-present possibility of fatal consequences in all operations of this nature, it is not believed that the defendant can rightfully insist upon further surgery of this kind. Crawford v. Tampa Inter-Ocean SS. Co., Inc., La.App. 1934, 155 So. 409. See also Frye v. Gold Pipe & Supply Co., La. App. 1951, 50 So.2d 38, among many others, including Bronson v. Harris Ice Cream Co., 150 La. 455, 90 So. 759; Simmons v. Blair, 194 La. 672, 194 So. 585.

So we must take the victim as we find him at this time as the only possible basis for solving his problem. Of course, it is possible that, if he succeeds ultimately in collecting the sum which would be awarded, he may choose to undergo another operation, with the possibility that his leg may be restored to substantially normal use. However, this necessarily involves only a possibility, and not a clear probability, of such strength as to be considered in determining his rights at this time.

■ If Hoover could have been continuously employed at the rate of $35 per week for the entire fifty-two in each year, his annual compensation would have been $1,820. However, it cannot be assumed, in the light of the evidence in this case, that he would have been so continuously employed, and even at that rate, his earnings would, in all probability, have been considerably less. Taking into consideration all of the evidence, I believe it establishes that a fair figure for his earnings on a yearly basis would not have exceeded $1,200. It cannot be contended that by loss of the use of one leg, Hoover was totally incapacitated for work of any kind for which he was fitted. Even with a brace or an artificial limb, he could perform such duties as farm work, car-washing, attention to livestock, yard-work and other types

of labor not requiring heavy lifting and strain upon the injured leg. Many "peg-legs" are able to do satisfactorily such types of work, depending upon the energy and willingness of the individual. For these reasons, my conclusion is that his impairment does not exceed fifty percent. On this basis, his loss in earning power would be approximately $600 per year, which, for a period of 42 years, would make a total of $25,200. Discounting this at a safe investment rate of three percent would produce the sum of $14,238.30, as the present value of that loss. For approximately eighteen months, while going through operations, recoveries, etc., he was unable to do any work and there should be added $1,500, or the other half of his yearly earnings, to make a total of $15,738.30. The record further establishes by a fair preponderance, that the plaintiff has expended or obligated herself to pay doctors' bills, medical and hospital expenses amounting to $1,665.50, which she should recover as tutrix on behalf of her said son, although she has erroneously claimed it in her individual behalf. This court would have no jurisdiction of the claim by her individually because it is below the minimum amount, and, if necessary, she will be allowed to amend to conform to the true situation by including it in the claim as tutrix.

Adding those items produces a total of $17,403.80. As to these amounts no question of inflation or reduced purchasing power of money is involved, for the simple reason that, as to the earnings, the same are susceptible of reasonably exact proof and would not amount to more whether spent by Hoover when earned or by his heirs in the event of his death. It simply represents what he would have actually earned for the time involved but for the injury. This rule is equally applicable to the doctors', medical and hospital bills, that is, they have been proven as definite figures.

With respect to pain, suffering, mental worry, and deprivation of other advantages which he would have had without the injury, as stated I shall consider the cases by the State Courts cited by counsel, and any other which seem pertinent, as guides in reaching a conclusion as to a fair recovery had the case been filed in the State Court. The first by plaintiff, Weadock v. Eagle Indemnity Co., La.App., 15 So.2d 132, in its facts and the nature of the injuries, is not at all similar to those in this case, but were far more serious and involved greater pain and suffering for a much longer period. But even there, the Court allowed only $30,000 for all elements save the medical expenses. This decision was rendered in 1943. The second case cited by plaintiff was Frye v. Gold Pipe & Supply Co., La.App.1951, 50 So.2d 38, in which the court stated that $1,000.00 was sufficient to compensate plaintiff for the small amount of pain he experienced on account of the accident and "also for shock".

Those cases cited by defendant were Hare v. New Amsterdam Casualty Co., La.App.1941, 1 So.2d 439, in which the plaintiff had sustained a fracture of both the tibia and fibula of the left leg, "with displaced fragments above and below the fracture" (quite similar to the present case). The lower court had given a judgment for loss of earnings, doctor bills, pain and suffering of a total of $4,000, and this was affirmed by the Court of Appeals. The court discussed extensively other similar cases, which are equally pertinent here, as a basis for its ruling.

The second case by defendant was Lindsey v. Gulf Ins. Co., La.App.1942, 7 So.2d 757, 761. This case involved a soldier at Barksdale Air Field, near Shreveport, who was injured in automobile accident. The nature of the injuries as stated by the court, for which the sum of $4,375 was allowed as total damages, were as follows:

"The evidence justifies the award made to plaintiff. He sustained a compound fracture of the left leg, involving both the tibia and fibula, a little lower than midway between the knee and ankle joints. The injury resulted in a destruction of some of the bone at the site of fracture, leaving a gap between the broken ends. Excruciating pain endured for a long period of time. When the trial was held, almost six months after the accident, plaintiff was still hospitalized, and it was thought that he would require hospital care for

from eight to twelve months longer. Furthermore, it appeared that some permanent disability would result from his injury.

"The judgment, for the reasons above given, is affirmed."

The third case cited by defendant was Martin v. Toye Bros. Yellow Cab Co., La. App.1935, 162 So. 257, 258, 260. The judgment given by the lower court in the sum of $6,000, for all purposes, was affirmed, and in doing so, the court said:

"Plaintiff, a young negro 28 years of age, suffered a compound, comminuted fracture of the left leg at the junction of the middle and lower third, necessitating its amputation below the knee. He was awarded $6,000, which we believe to be the proper amount. Danna v. City of Monroe, 129 La. 138, 55 So. 741; White v. Nutriline Mill. Co., 133 La. 870, 63 So. 385."

In the present case, Hoover unquestionably has undergone long and intensive pain and suffering through two operations on his right leg, and to the extent that his education and mentality make it possible, has also suffered much disappointment in the loss of the normal activities in which he could otherwise have engaged. The purchasing power of money within the past twelve years has decreased substantially, or approximately one-half.

On the basis of what the State Courts have allowed for pain, suffering, mental anguish, etc., in leg injuries similar to this case, when money had not been so depreciated, I am justified in concluding that $2,500 would have been sufficient for a single operation or experience, accompanied by the condition shown here. But this claimant had two such experiences, the second more severe than the first. This would warrant an allowance of a total of $5,000 in normal times, and in view of a loss of fifty percent in the purchasing power of money at this time, he is entitled to recover $10,000 for this element.

Adding this to his loss of earnings and medical expenses of $17,403.80, makes a total of $27,403.80, for which the plaintiff should have judgment.