[Civ. No. 4249.   Fourth Dist.   Sept. 26, 1951.]

SIMONE IRENE PHILLIPS et al., Respondents, v. OGLE
ALUMINUM FURNITURE, INC., et al., Defendants;
H. L. BENBOUGH COMPANY, LTD. (a Corporation),
Appellant.

Gray, Cary, Ames & Driscoll, Ward W. Waddell, Jr., H. Pitts Mack for Appellant.

Brooks Crabtree and Charles B. Provence for Respondents.

GRIFFIN, Acting P. J. — Plaintiffs and respondents obtained a judgment against defendant and appellant H. L. Benbough Company, Ltd., a corporation, the operator of a retail store, for personal injuries and damages alleged to have occurred as the result of certain defective workmanship in assembling an aluminum tubular kitchen chair sold by it to respondents. Defendant Ogle Aluminum Furniture, Inc., manufacturer of the chair, sold it to appellant in a "knocked

down'' condition. This particular defendant went bankrupt and was not served with process.

Respondents' evidence shows that they rented an unfurnished apartment, went to appellant company's store, discussed their problem with the sales agent and decorator, and accordingly purchased considerable furniture, including a kitchen table and four chairs (which chairs were made of 1-inch aluminum tubing, so bent as to form a ''U'' at the base, running thence upward in front and across to the rear of the chair parallel to the floor, forming the base for the seat, thence continuing upward, forming the support for the back. The two ends of the tubing were beveled and terminated about 12 inches above the seat. The seat and back consisted of $\frac{1}{2}$ inch plywood with about $\frac{1}{4}$ inch of leatherette upholstering. Each was laid across and fastened by means of screws which penetrated through holes drilled through the tubing and into the plywood.) There were two screws on each end of the seat as well as each end of the back. According to the testimony of the factory representative, these chairs were shipped to the retailer ''knocked down.'' Eight or nine $1\frac{3}{8}$ inch cadmium plated oval head wood screws were contained in an envelope tied to the tubing for each chair. The plywood seat and back were not attached but had ''starter holes'' punched in the back so the retailer could assemble them with proper alignment by inserting the attached screws through the tubular punch holes and by screwing them into the plywood. Due to the curvature of the tubing there was no direct support for the back part of the seat. Accordingly, the chair tended to sag toward the back when weight was placed upon it. The chair weighed about 6 pounds, and due to the curvature of the tubing as it left the floor, the chair did have a tendency to tip forward if weight was placed upon it near the front.

About 30 days after the furniture was delivered to respondents, Mrs. Phillips, who weighed about 98 pounds, used the chair to stand on to put a sugar bowl in a cupboard above her refrigerator. According to her story she had on her house slippers, stood up on the seat of the chair, put the sugar bowl in its place, and when she placed her hand on the back of the chair to get down the back fell off and caused her to fall on one of the sharp uprights, which went into her body, piercing her vaginal wall and her bladder and causing her serious injuries. She was about three months pregnant at the time. The chair remained standing and it was necessary for Mrs.

Phillips to pull the upright out of her body. The injury was claimed to have been due to the improper and negligent manner in which appellant attached the plywood back to the uprights by putting in shorter screws than those furnished by the factory.

Appellant, in its answer, denied that it had assembled the chair, denied negligence on its part, and alleged contributory negligence on the part of respondents. The jury returned a verdict in favor of Mrs. Phillips for $25,000, and in favor of Mr. Phillips for $3,500.

On this appeal appellant first argues that the evidence was insufficient to justify the verdict, but concedes that the evidence was sufficient to support a finding that the back of the chair was not fastened as securely as it might have been to the uprights because the four screws found in the home of respondents, after the accident, were shorter by at least a quarter of an inch than the ones the agent of the factory testified were sent with the chairs supplied by it. It is respondents' argument that the appellant company substituted shorter screws of its own and as a result they pulled out of the plywood back with much more ease. There is evidence that appellant did assemble different types of such chairs and had extra screws of a shorter length in its stock, but it denied using any screws not sent by the factory with the chairs. Appellant contends that this evidence "came a long way" from proving that appellant was negligent or that its acts were a proximate cause of the injuries. In this connection it is also argued that there was no evidence that the chair was not perfectly safe for the sole purpose for which it was constructed, i.e., for sitting on it, and that it was not designed to be used as a substitute for a stepladder, citing such cases as *Waterman* v. *Liederman,* 16 Cal.App.2d 483 [60 P.2d 881, 62 P.2d 142]; *Schfranek* v. *Benjamin Moore & Co.,* 54 F.2d 76; and *MacPherson* v. *Buick Motor Co.,* 217 N.Y. 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696]. In this connection the court gave the following instruction:

". . . that if a retailer takes part in the manufacturing of an article, or assembles the component parts of an article that is either inherently dangerous or reasonably certain to be dangerous if negligently made or assembled, such retailer owes a duty to the public generally and to each member thereof who will become a purchaser or a user of the article. That duty is to exercise ordinary care with reference to the

work done by such retailer to the end that the article may be safely used for the purpose for which it was intended and for any purpose for which its use is expressly or impliedly invited by the manufacturer or such retailer. Failure to fulfill that duty is negligence.''

In reply, respondents point out that it is a matter of common knowledge that people regularly and habitually use chairs to stand on in their homes which is an exceptable vicissitude, and that such use is lawfully allowed; that when chairs are sold to the public the seller is charged with such knowledge; that there is an implied invitation to so use it; and that the standard of negligence is measured by the common experience of mankind. In this connection counsel for respondents asked each juror, on *voir dire*, whether he or she ever stood on a chair in their home and the great majority answered in the affirmative. However, a number stated that they had not stood on chairs of this type. It is further pointed out that respondents told the decorator the plans of their kitchen; that the refrigerator had to be of a certain height because there was a cupboard above it; that he pointed out these chairs and table and made no recommendation as to additional furniture in the kitchen. Mr. Phillips testified the chairs looked ''good and sturdy'' so he bought them.

Although the ordinary use of a chair is to sit on it, it cannot be said, as a matter of law, that it could not be reasonably anticipated that the described chairs would be used for the purpose of standing upon them. (*Kalash* v. *Los Angeles Ladder Co.*, 1 Cal.2d 229 [34 P.2d 481]; *Sheward* v. *Virtue,* 20 Cal.2d 410, 412 [126 P.2d 345]; *Leenders* v. *California Hawaiian etc. Corp.*, 59 Cal.App.2d 752 [139 P.2d 987].) This question, as well as the question of whether the negligence of appellant was a proximate cause of plaintiff's injuries, were factual questions for the jury to determine, and it did so under instructions fully covering those issues.

We will next discuss the contention that standing on a chair of this design was contributory negligence as a matter of law on the part of respondents. Appellant argues that ordinarily the question of contributory negligence is one largely of fact for the jury, but in the instant case the conduct of the respondents was so plainly negligent that the question became one of law, citing such cases as *Jones* v. *Southern Pac. Co.*, 34 Cal.App. 629 [168 P. 586]; and *Kauffman* v. *Machin Shirt Co.*, 167 Cal. 506 [140 P. 15].

It appears from the evidence that no particular inspection by respondents, short of taking the chair apart,

would have divulged that the back was attached by short or inadequate screws. We conclude that the question whether Mrs. Phillips was negligent in standing upon this particular chair, under the circumstances, and whether such negligence, if any, contributed proximately to the cause of her injuries, was a factual question for the jury to determine. (*Dobbie* v. *Pacific Gas & Electric Co.*, 95 Cal.App. 781 [273 P. 630]; *Buckingham* v. *San Joaquin Cotton Oil Co.*, 128 Cal.App. 94, 101 [16 P.2d 807].)

■ The next claimed error involves the instruction set out above and was in reference to the duty required of a retailer who assembles the component parts of an article sold by it. This instruction was offered by the respondents and given by the court. It is claimed that it°is misleading because, by its wording, it repetitiously gave the jury the impression that it was the opinion of the court that the chair was an article which was either inherently dangerous or "reasonably certain" to be dangerous if negligently assembled. We see no merit to this claim.

The next argument is that the instruction "insinuates" that there was an invitation, either express or implied, to use the chair for some other purpose than that for which it was intended, and that there was no evidence supporting such an invitation. We do not so construe the instruction. This was a general instruction and patterned, to a degree, after B. A. J. I. No. 218, page 425, relating to liability of a manufacturer of an article. In *MacPherson* v. *Buick Motor Co., supra,* at page 1053, the court discusses the rule pertaining to the liability of a manufacturer to his customers, who puts the finished product on the market, to be used without inspection by its customers. It says: "If he (the manufacturer) is negligent, where danger is to be foreseen, a liability will follow." It has likewise been held that a manufacturer of a commodity has the duty to see the probable results of the normal use of a commodity or of a use which can reasonably be anticipated. (Restatement of the Law of Torts, p. 1073, § 395; *Sheward* v. *Virtue*, 20 Cal.2d 410 [126 P.2d 345]; *Waterman* v. *Lieder-man, supra; Gorman* v. *Murphy Diesel Co.*, 42 Del. 149 [29 A.2d 145]; *Zesch* v. *Abrasive Co. of Philadelphia*, 353 Mo. 558 [183 S.W.2d 140, 156 A.L.R. 469]; *Schfranek* v. *Benjamin Moore & Co., supra; White Sewing Machine Co.* v. *Feisel*, 28 Ohio App. 152 [162 N.E. 633]; 65 C.J.S. pp. 629-633, § 100.) ■ Appellant cannot be heard to complain because it, under the instruction, was bound by the same rule of

liability as a manufacturer, pertaining to the particular part appellant played in assembling the manufactured article, before a recovery could be had. Unnecessary repetition of a rule of law is condemned as an unwholesome practice. We do not, however, believe prejudicial error resulted in this respect. (*Paulos* v. *Market Street Ry. Co.*, 136 Cal.App. 163 [28 P. 94].)

■ Another instruction criticized is one given to the effect that one who herself is exercising ordinary care should assume others have performed their duty under the law. The argument is that the court should have given a similar instruction applying to appellant. No instruction was offered by appellant in this respect and accordingly no prejudicial error can now be claimed. (*Mauchle* v. *Panama-Pacific Int. Exp. Co.*, 37 Cal.App. 715 [174 P. 400].)

■ The claim that the verdict was excessive, under the evidence, is without merit. As a result of the accident Mrs. Phillips suffered a traumatic vesicovaginal fistula. She was at the time three months pregnant. Emergency surgery was performed and she was on the hospital "serious list" for 18 days following the operation. She spent 27 days in the hospital, and suffered considerable pain. She was highly nervous and concerned about the future birth of her baby and, according to the doctor's testimony, they could not tell whether she would have to have an abortion, whether she would have the child naturally, or whether the child would be normal when it arrived. She was confined to her bed for about three weeks after she returned home and spent a portion of her time in bed for one year thereafter. Five weeks after returning from the hospital the scar tissue broke down and caused considerable difficulty for a period of nine months. Her child was born about five weeks prematurely and his diminutive size worried her. A second operation was performed to repair the vesicovaginal fistula, at which time she spent 17 days in the hospital. According to the testimony of the doctor her bladder was permanently decreased in size due to the two operations and will cause her considerable inconvenience the rest of her life. The doctor also testified that it would be unwise for her to have another natural birth of a child due to the possibility of the scar tissue breaking down, and recommended that any future children be delivered by Caesarean section. Respondents claim that all of this knowledge which was imparted to her is causing and in the future will cause her great mental suffering and anxiety.

As to Mr. Phillips, he testified that he lost the services of his wife during the period of one year after the accident, since she was a semi-invalid during that time and that he incurred special damages in excess of $1,500. The trial court considered all of these questions on a motion for a new trial which was denied. No abuse of discretion appears. The judgment rendered, under the circumstances, cannot be held to be excessive. (*Holmes* v. *Southern Calif. Edison Co.*, 78 Cal. App.2d 43 [177 P.2d 32]; *Johnston* v. *Long*, 30 Cal.2d 54 [181 P.2d 645].)

Judgment affirmed.

Mussell, J., concurred.

A petition for a rehearing was denied October 22, 1951, and appellant's petition for a hearing by the Supreme Court was denied November 19, 1951. Edmonds, J., and Schauer, J., voted for a hearing.