[Civ. No. 25840.   Second Dist., Div. Three.   July 25, 1962.]

LEO P. MERTES, Plaintiff and Respondent, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant and Appellant.

Parker, Stanbury, McGee, Peckham & Garrett, Robert W. Walker, J. H. Cummins and Raymond G. Stanbury for Defendant and Appellant.

Irving H. Green, Rose, Klein & Marias and Andrew J. Weisz for Plaintiff and Respondent.

FORD, J.—In an action to recover for personal injuries the jury returned a verdict for the defendant. The trial court granted the plaintiff's motion for a new trial on the ground of the insufficiency of the evidence to support the verdict. The appeal is from that order. It is the defendant's contention that there was no evidence sufficient to support a verdict for the plaintiff.

The action arose out of an accident which occurred on October 10, 1957, in the vicinity of the Permanente Cement Company plant at Cushenbury, California. The plaintiff was an employee of Permanente and was loading dry cement through

a hose into a hopper freight car owned by the defendant railway company and supplied by it to Permanente. While engaged in raising a lever on top of the car so that a hatch could be opened, the plaintiff fell from the car and suffered serious injuries.

The evidence and the reasonable inferences which find support therein will be related in the light most favorable to the plaintiff; conflicting evidence and inferences will be disregarded. Along the top of the car and near its outer edge was a longitudinal bar. About mid-point in the bar a lever was attached to it. The lever was about 22 inches long. When the lever was lowered against the roof and put in a horizontal position, it could be secured in its resting place by means of a pin. When the lever was raised upright and toward the edge of the car, "dogs" or lips which secured the various hatch covers on that side of the top of the car were released; the hatch covers could then be opened manually. Normally, when the lever was raised it came to rest in a vertical position.

The plaintiff was about 5 feet 8 inches tall and weighed about 150 pounds. He testified that when he went up on top of the car on the morning of the accident, the hatch covers were down on the hatches and the lever was in an upright position. He lifted up one of the hatch lids and placed the hose in it. The hose was about 10 inches in diameter. After the hatch was filled, he pushed the hose over the side of the car and lowered the hatch cover. He then put the lever down because "it would be in the way of the hose pulling it over at that side of the car." When he pulled the lever down, "it was tight." He placed it "all the way down into the slot." He then pulled the hose over and secured it on the catwalk. He next proceeded to raise the lever. As to his actions, he testified in part as follows: "A. Well, I reached down, crouched down and got a hold of the lever and it was tight, so I got it all the way down and put my hand, my left hand on the hatch lid cover on the top to give me leverage and gave another pull and the handle gave way and caused me to go over the side of the car. Q. Well, how far over did the handle go with you? A. All the way. Q. Well, in the normal operation of the car, how far would the handle normally go? A. Straight up and down. . . . [Q.] Well, did you have any knowledge that the lever would go all the way over the car? A. No. Q. Did you expect the lever to stop in the upright position? A. Yes, I did." The plaintiff testified that he was facing the silo from which the cement was being

taken. He demonstrated how the accident occurred, the demonstration being described by the court as follows: "The witness indicated by putting his left hand down to the floor, picking up the yardstick representing the lever and pulling the lever up with his right hand. At the same time, his body going forward and his head bent down a little up to that point and then you went over the side of the car? THE WITNESS: Yes, your Honor. MR. STANBURY [counsel for defendant] : May the record also show that in demonstrating Mr. Mertes started out with a crouch and was in a crouch at all times but was rising up to less of a crouch as he went forward. THE COURT: Yes. Starting with a crouch and rising up to the front from the crouch." After a further demonstration, the court said: "And the witness now demonstrates by putting his left hand down on the left hatch and his right hand on the lever from a crouched position raising up from the crouched position and going forward, but never rising to an upright position, I would say, about half upright position." The plaintiff testified that the lever went up and then over the side of the car. He lost his grip on the lever as he was "[s]tarting over the side." He further testified concerning his act of raising the lever as follows: "A. I grabbed the handle and started to pull it up and it gave way suddenly. Q. And when it went, did it stop at the upright position? A. No, it went straight over the side. Q. And was your hand still on the handle when you started to go over? A. No. Q. Where did you leave the handle? A. About in the straight up and down position. Q. *As it started to go over the side?* A. *That's right.* . . . Q. As you were raising that handle, did you have any reason to believe that the handle would not stop in the customary place? A. No. . . . Q. At the time you attempted to raise the lever, the time you fell, what were the positions of the dogs as far as the hatch covers were concerned? A. They were laying on top." (Emphasis added.)

Joseph Edwin Makinen, another employee of Permanente, was working about 100 feet away from the cement silos. Shortly after the accident he went up on top of the railway car. The lever was over the side of the car. As to what he saw when he examined the lever, the witness said: "Well, I knew that there is supposed to be what they call a dog that catches the lock bar handle as you push it to the side (indicating). It only goes so far and it has a stopper on it and I noticed it went all the way down and I stooped down to look what caused that and the dogs were broken off and they—*the break*

*on it was an old rusty break. . . .''* (Emphasis added.) He further testified as follows: ''. . . if I said the dog was broken, the dog wasn't broken. It's the catch that catches the dog.''

Louis L. Luthey, the defendant's superintendent of shops at San Bernardino, was called as a witness on behalf of the defendant. He testified in part as follows: ''Q. . . . Can you tell us what the purpose is of having stops on that lever which normally keep it in a substantially upright position? A. Well, the stops are put on there to keep the lever from going over into a horizontal position away from the side of the car which would give you an obstruction or impaired clearance if you was maybe to meet a train or if you was moving it to a shop area or plant where you might have impaired clearances and it would also exceed your safety limits on width which might knock a man off the side of another car should they pass with a man riding another car. . . . Riding on the ladder.'' The witness had never seen tests made to determine whether the strength of such levers was sufficient to support the weight of a man.

On cross-examination Mr. Luthey testified as follows as to the inspection practices of the defendant with respect to freight cars: ''A. Well, our inspection practices generally, in a train yard, is for the rolling portion or the wheels; braking, riggings and so forth and safety appliances. Q. . . . You don't inspect to see whether the lifting levers on these hopper cars and the mechanism connected with it are in safe condition? A. Well, I wouldn't say as far as safe condition. In operative condition; not technically. . . . Q. In other words, you just look them over. If there is a stop gone on the lever, you don't pay any attention to that. . . . ? A. In a normal running—one-two inspection, you would not, no, sir. . . . Well, if one stop is missing, the other stop is sufficient to hold it. . . . No, I wouldn't cut it out for repair. . . . Q. So, you would send a car to a plant to be filled with cement that had a stop on the lever missing or misplaced? A. Quite possibly so.'' The witness further testified: ''Q. And you knew that sometimes the mechanism of these levers around the places where they would rotate, since cement had been used, could be filled with cement or dirt or other, or rust, and in that way make these levers hard to operate, did you not? A. It would make it more difficult to operate.'' When shown a picture of a car with the lever over the side, the witness stated that ''it shows that both lugs are missing,''

He further said that if he noticed that both lugs were missing on a car, he "would have it fixed," but not if only one lug was missing. He also testified as follows: "And [if you saw that] the stop or lug . . . was broken off or rusty, you would know it had been broken off for a long time, wouldn't you? A. I think you would have to assume that."

In the review of the trial court's order in this case, the governing law is that expressed in *Brown* v. *Guy*, 144 Cal. App.2d 659 [301 P.2d 413], at page 661: "Upon the consideration of a motion for a new trial the [trial] court must make an independent appraisal of the evidence, including all presumptions and reasonable inferences, and must judicially determine whether the judgment effects a miscarriage of justice. In considering such a motion the trial court is not bound by a conflict in the evidence but may be governed by any substantial proof that would reasonably warrant a judgment for the moving party even though such evidence consists of nothing more than inferences from established facts. On appeal from the order it will not be reversed unless the reviewing court concludes that as a matter of law there is no substantial evidence to support a contrary judgment. [Citations.]"

The duty which rested on the defendant has been recently stated in *Garner* v. *Pacific Elec. Ry. Co.*, 202 Cal. App.2d 720 [21 Cal.Rptr. 352]. Therein the court said at pages 731, 732: "A railroad has the duty to use ordinary care to deliver cars which are reasonably safe for loading and unloading by the employees of the concerns to whom the cars are delivered for use. It follows that there is a duty to make reasonable inspections of the cars to the end that defects therein may be ascertained and to warn of or to repair the defects thus found. [Citations.]" (See also *Rylander* v. *Chicago Short Line Ry. Co.*, 17 Ill.2d 618 [161 N.E.2d 812, 814].)

The appellant asserts that the stops "were not intended to do anything but stop the lever upright." But the problem presented on this appeal cannot be resolved by a mere determination of the purpose which the lever was designed to serve. (See *Phillips* v. *Ogle Aluminum Furniture, Inc.*, 106 Cal. App.2d 650, 653-654 [235 P.2d 857].)[1] Rather, the

[1] In the case cited, the plaintiff suffered injuries when the back of a chair, on which she was standing, fell off. The court said (106 Cal. App.2d, at p. 654): "Although the ordinary use of a chair is to sit on it, it cannot be said, as a matter of law, that it could not be reason-

governing law is that stated in *Tucker* v. *Lombardo,* 47 Cal.2d 457 [303 P.2d 1041], at pages 464-465, as follows: "It is an elementary principle that negligence is gauged by the ability to anticipate danger. '[R]easonable foresight of harm is essential to the concept of negligence, and supplies the criterion for determining whether it exists in a particular case, and reasonable foreseeability of harm is the fundamental basis of the law of negligence. . . . On the other hand, one is not bound to foresee every possible injury which might occur, or every possible eventuality, but only those which were reasonably foreseeable; and one is not required to anticipate against dangers which it is not his duty to avoid.' (65 C.J.S. § 5c (2)(a), pp. 354-359.)"

As said in *Johnson* v. *Nicholson,* 159 Cal.App.2d 395 [324 P.2d 307], at page 409: "Where there is uncertainty as to the existence of negligence the question is not one of law but of fact to be settled by the jury; and this is so whether the uncertainty arises from a conflict in the evidence or because fair-minded men will honestly draw different conclusions from undisputed facts."

In the present case the trier of fact could properly draw the inference that it was reasonably to be anticipated that under usual circumstances a man operating the lever would automatically adjust the balance of his body as the lever came to a stop in a vertical position at the edge of the top of the car. Consequently, such trier of fact could reasonably reach the conclusion that the defendant railway company should have foreseen that if the lever was defective so that it would not come to rest at that point, the person operating the lever would thereby be placed in danger of losing his balance as the lever unexpectedly went forward. Because of the rusty condition existing at the point of defect in the lever mechanism, it was a fair inference that the defect was one which had existed for a substantial period of time and, consequently, one as to which the railway company was charged with notice. (Cf. *St. Louis-San Francisco Ry. Co.* v. *Ewan,* 26 F.2d 619, 621; *Cox* v. *Chicago, Rock Island & Pac. R.R. Co.,* 250 Minn. 187 [84 N.W.2d 263, 266].) Accordingly, the evidence was sufficient to sustain, although it did not compel, a determination that the defendant railway company

---

ably anticipated that the described chairs would be used for the purpose of standing upon them. [Citations.] This question, as well as the question of whether the negligence of appellant was a proximate cause of plaintiff's injuries, were factual questions for the jury to determine. . . ."

had failed to comply with the duty it owed to the plaintiff.[2]

The defendant contends that the defect in the lever was not a proximate cause of the accident. Part of the argument is: "First, considering the device in its defective condition, it is manifest that any person falling toward the edge of the car would be beyond saving by a single handhold, knee high and behind him, by the time the lift lever reached a vertical position. He could not even maintain his grip in such position, and respondent actually admits that he did not." It is further asserted that the plaintiff "was already irretrievably falling when the lever reached the vertical position."[3] While such argument may be persuasive when addressed to the trier of fact upon a retrial, the record in the present case is such that it is not within the province of this court to determine that so-called natural laws must take precedence over the inference that the plaintiff would have been able to adjust his balance so as to avoid a fall if the lever had not gone beyond its normal position. (See *Butticci* v. *Schindel Furniture Co.,* 152 Cal.App.2d 165, 168 [313 P.2d 62].) Whether negligence on the part of the defendant was a proximate cause

[2]The defendant directs the attention of the court to the following testimony of the plaintiff: "Q. . . . Now, when you were going through this lifting operation, were you expecting and relying upon this lever to keep you from going over the edge? A. No." But in passing upon the motion for a new trial based upon the insufficiency of the evidence, it was the exclusive province of the trial court to judge the credibility of the witnesses, determine the probative force of testimony, and weigh the evidence. (*Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305, 307 [163 P.2d 689].) To the extent that the quoted testimony could be said to have been inconsistent with other testimony of the plaintiff or inferences reasonably to be drawn therefrom, the following statement found in *Dillard* v. *McKnight,* 34 Cal.2d 209 [209 P.2d 387, 11 A.L.R.2d 835], at page 223, is apropos: "Likewise questions as to the credibility of a witness and the determination of conflicts and inconsistencies in his testimony were for the trial judge."

[3]In another part of its opening brief, the defendant expresses its argument on that subject in part as follows: "The Court will observe from the various photographic exhibits, and from the model, that when in a vertical position the lever stands at *the very edge of the car.* Any person falling forward, as respondent admittedly was, would be beyond saving, and irretrievably falling, by the time the lever reached the vertical position in which the missing stops were designed to stop it.

"This will be apparent if the Court will picture his position at such a time. His hand is on the lever at *knee level.* He is pitching forward in a position between a crouch and an upright position. Therefore his center of gravity is far above and beyond his knee high handhold and, with the hand in a position directly above the *edge* of the car, is *already over the side.* He has nothing but a single handhold, now *behind* as well as *below* his center of gravity, and nothing but the fingers of one hand to arrest his momentum and to break the fall to which he is already committed."

of the injury to the plaintiff was a question of fact. (See *Jackson* v. *Barnett,* 160 Cal.App.2d 167, 172 [324 P.2d 643].)

The order is affirmed.

Shinn, P. J., and Files, J., concurred.

A petition for a rehearing was denied August 20, 1962, and appellant's petition for a hearing by the Supreme Court was denied September 26, 1962.