[Civ. No. 5075. Fifth Dist. Aug. 3, 1982.]

VERLYN DALE BERGMAN, Plaintiff and Respondent, v.
ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, Defendant
and Appellant;
GEORGIA-PACIFIC CORPORATION, Intervener and Respondent.

**COUNSEL**

Martin, Crabtree, Schmidt & Zeff, John W. Martin, Morris, Polich & Purdy, Landon Morris, Robert S. Wolfe and Gerald Paul Schneeweis for Defendant and Appellant.

Siegfried Hesse, Joseph J. Brecher, Hildebrand, McLeod & Nelson, John J. Farrell, for Plaintiff and Respondent. Mentz, Finn, Gilbert & Clarke, and Thomas M. Finn for Intervener and Respondent.

**OPINION**

**GOMES, J.**\*—Verlyn Bergman, respondent herein and plaintiff below, was injured while working at the Georgia-Pacific plant in Modesto when the handle came off of a boxcar door he was attempting to close during the course of his employment. The boxcar, No. 61400, was owned by St. Louis Southwestern Railway Company (SSW), appellant herein and defendant below, and delivered to the Georgia-Pacific plant by Modesto & Empire Traction Co. (M&ET), a local short-line railroad. M&ET and appellant were found by a jury to have been negligent on the day of the accident for a total shared liability of $138,715.

Appellant attacks the judgment of negligence as not being supported by substantial evidence. We agree.

On August 15, 1977, the day of the accident, Felix Berbino, a coworker of Bergman's, opened the doors of three fully loaded boxcars for unloading. Among the boxcars Berbino opened was boxcar No. 61400, the boxcar involved in the accident.

Boxcar No. 61400 contains double doors called "plug doors." One door has a handle on it that is turned counterclockwise to open the door. As the handle is turned, a series of gears behind the handle manipulate various locking devices on the door and permit the door to be pulled out and opened.

The handle on the doors is made of steel and is about two to two and one-half feet long. It is shaped like the letter "T" lying on its side, with

---

\*Assigned by the Chairperson of the Judicial Council.

the crossbar of the "T" representing the handle and the stem of the "T" representing a shaft that goes into the door.

Berbino testified that he opened the doors on boxcar No. 61400 without any difficulties, that he had a good opportunity to scrutinize the handle and did not see anything wrong. Had he observed any defects, he and the other workers had standing instructions to report anything wrong with a car to the foreman.

After the boxcar was unloaded, Bergman closed the doors and proceeded to lock them by turning the handle. He testified at trial that the handle appeared to be in normal condition when he looked at it. He did not notice any defects and had heard nothing from Berbino or anyone else about problems with it.

The handle came off as Bergman was turning it causing him to lose his balance, fall, and injure himself.

After his fall respondent took the handle to the office of his foreman, John Killian. The door handle was left on his desk for several weeks and eventually it was discarded. No expert evidence of any tests on the handle to determine the cause of the handle coming off was presented at trial.

Appellant is the owner of boxcar No. 61400. SSW's ownership of the boxcar does not mean that the boxcar always operates under SSW's control. SSW frequently delivers the boxcar, both loaded and unloaded, to other railroads which operate it on their lines and which exchange it (interchange) with still other railroads or which deliver the boxcar to the ultimate destination.

The main line railroads which use the boxcar also assume the responsibility for its repair should it be "bad ordered," i.e., in need of repair, maintenance, or cleaning. While in the repair shop, the railroad repairmen check out all aspects of the car to determine its fitness for continued service. At any interchange or switching points, employees of the new carrier also inspect the car for defects to determine if it is safe for moving.

SSW parted possession with boxcar No. 61400 on April 13, 1977. Between that day and the day of the accident the boxcar was continually in use, being operated by four different carriers throughout the

western United States from Texas to Oregon before being delivered to the Georgia-Pacific plant in Modesto. It was loaded and unloaded at least 14 times. It was bad ordered for repairs several times, each time being released as safe for use. There is no evidence that the door handle was the subject of any bad order.

On August 12, 1977, the boxcar was interchanged from Southern Pacific, the last carrier to haul it, to M&ET at Modesto with the M&ET crew inspecting the boxcar at the interchange point to determine that the doors were shut and that the car was safe for moving. The loaded boxcar was moved by M&ET from the switching point to the spur track adjacent to the Georgia-Pacific loading dock. The boxcar was left there on August 12 where it remained until respondent was injured on August 15.

In the boxcar's travels during the four months preceding the accident, it was under the control of Southern Pacific Company, Milwaukee Railroad, Santa Fe, and finally M&ET, none of which carriers ever reported to SSW problems or potential problems with the door handles. Similarly, SSW never received any such reports when the boxcar was bad ordered or when it was inspected for defects at any of the interchange points.

The boxcar was last subject to such an inspection when M&ET picked it up from Southern Pacific at the interchange in Modesto. No defects were discovered. The usual practice would be for the M&ET crew to walk the length of the seven cars destined for Georgia-Pacific, inspecting both sides of the cars for defects. Similarly, neither Berbino nor respondent observed any problems with the doors or the handles.

### DISCUSSION

The cause was tried solely on a theory that defendants' negligence proximately caused injury to the plaintiff. Therefore, this appeal rests on the sole issue of whether there was sufficient evidence produced to sustain the finding, by special verdict, that appellant was negligent.

Appellant correctly asserts that mere ownership of the boxcar does not make the owning railroad strictly liable for any injuries resulting from a defective car. (75 C.J.S., Railroads, § 924(d), pp. 333-336; see *Powell* v. *Pacific Naval etc. Contractors* (1949) 93 Cal.App.2d 629 [209 P.2d 631].) Respondent had to prove appellant negligent and that

burden included proof that the causally connected defect was one that appellant should have discovered through reasonable and careful inspection, or was one apparent to an ordinary person, having an opportunity to discover it.

Respondent argues there exists a "special duty of care" established under California law, owed by appellant to those who load and unload the boxcar they owned. Two cases are cited in support: *Garner* v. *Pacific Elec. Ry. Co.* (1962) 202 Cal.App.2d 720 [21 Cal.Rptr. 352, 99 A.L.R.2d 165], and *Mertes* v. *Atchison, T. & S. F. Ry. Co.* (1962) 206 Cal.App.2d 64 [23 Cal.Rptr. 320].

Neither of these cases deals with the duty of a railroad which owns but does not operate the defective boxcar as is the case here. Instead, in both *Garner* and *Mertes*, the owning railroad was also the operating railroad, and in both cases the same railroad that owned the unsafe boxcar delivered the car to the premises where the injury occurred.

Respondent, at trial, never established, nor attempted to establish, that any of the various railroads which operated boxcar No. 61400, acted together as alter egos of another. Barring such proof, each must be considered a separate entity: the negligence of one cannot be imputed to the other. ■ Vicarious liability will be imposed only when a person acts through another to accomplish his own ends. (*King* v. *Ladyman* (1978) 81 Cal.App.3d 837, 842-843 [146 Cal.Rptr. 782]; *Roberts* v. *Craig* (1954) 124 Cal.App.2d 202, 208 [268 P.2d 500, 43 A.L.R.2d 1146].)

We note the complexities of arguments on appeal by both appellant and respondent regarding the respective duties of care of defendant railroads, and the arguments regarding the contiguous duty of reasonable inspection imposed on each.

However, we find the appeal turns on whether there was sufficient evidence introduced at trial to support a verdict that appellant was in any way negligent. Appellant maintains in particular that there was not sufficient evidence of a defect in the boxcar of a type which could have been discovered by a reasonably thorough inspection of the car. Appellant bears a heavy burden in attacking the sufficiency of the evidence.

■ This court looks only at the evidence supporting the successful party, and disregards any contrary showing, resolving all conflicts in fa-

vor of the respondent. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].) Even if reasonable to do so an appellate court cannot substitute the inferences it may draw from the evidence for those drawn by the jury. (*Hamilton* v. *Pacific Elec. Ry. Co.* (1939) 12 Cal.2d 598, 602-603 [86 P.2d 829].) Since the evidence about the condition of the boxcar door handle was undisputed, the issue becomes whether the testimony supports the inference that the handle was defective when appellant had the duty and opportunity to inspect it, and further, if the defect was one that should have been detected and corrected.

The only "proof" of appellant's negligence arises from the testimony that the boxcar door handle, the accident causing instrumentality, was "rusty" when it came off. Appellant correctly contends that no evidence was presented to show the mere presence of rust had anything to do with the dislocation of the handle.

Respondent himself and Mr. Berbino who opened the boxcar door both testified they noticed no defect. The only testimony about the condition of the handle came from respondent's foreman, Mr. Killian, who looked at the handle and the door immediately after the accident.

Respondent asserts that from Killian's testimony the jury reasonably could conclude that the handle was "shot through with rust," that it "must have been building up for years" and that the boxcar door handle was "highly deteriorated" with a "longstanding rusty condition." The record, however, reveals much less:

"Q. What was the condition of the handle when you saw it? What did it look like?

"A. [Mr. Killian] It was rusted.

"Q. Was the—was there a shaft attached to the handle?

"A. Yes.

". . . . . . . . . . . . . . .

"Q. Was there any gears, little gears or anything attached in any way to that handle?

"A. After thinking about it, there was a small gear on the back of it, I believe.

"Q. And what was the condition of that little gear on the back of it?

"A. It was rusty too.

". . . . . . . . . . . . . . .

"MR. FINN: Was the handle itself rusty, Mr. Killian?

"THE WITNESS: Yes.

"MR. FINN: No other questions.

"FURTHER RECROSS-EXAMINATION BY MR. FORD:

"Q. But the area that you saw rust on was the back side of the handle and the front side of that plate where they are welded together?

"A. The whole handle was rusty, yes."

Killian further stated that rust on railroad cars was "common" and that he did not know whether the rust on the handle had anything to do with the failure.

What the testimony reduces to is that the broken handle did not appear abnormal; it was rusty but this is a common condition for railroad equipment. There was no testimony on the critical point; was there rust or deterioration on the surface where the break occurred? The record is silent on this point. From reviewing the record, there appears no evidence that a "break," in the strict sense, even occurred, only that the handle "fell off." It was sheer speculation on the jury's part to infer that rust on the outside of the handle had anything to do with the break on the inside of the boxcar door. Such a conjecture cannot substitute for proof of an essential fact. (*Reese* v. *Smith* (1937) 9 Cal.2d 324, 328 [70 P.2d 933].)

The apparent break occurred back in the gears in the interior of the door, thus it is clear, the defect was concealed and conceded by respon-

dent to be latent. As respondent testified in response to the court's questioning:

"THE COURT: ... As I understand the pictures, it seems to me very simple. As I understand it, correct me if I'm wrong, you have a door; there's some gears inside.

"THE WITNESS: Yes, sir.

"THE COURT: There's a steel plate on the outside and this [handle] attaches there.

"THE WITNESS: Yes, your Honor.

"THE COURT: So, you don't see any gears, do you?

"THE WITNESS: No, sir.

"THE COURT: So, if there was anything wrong in the interior, you couldn't see it anyhow, could you?

"THE WITNESS: No, sir.

"THE COURT: I don't know what all the fuss is about."

The rusty condition of the handle demonstrates only that being positioned on the outside of the car, the handle was exposed to various weather conditions.

■ Respondent's request for instructions to the jury on the doctrine of res ipsa loquitor properly was refused by the court. The requirement that an accident be caused by an instrumentality within the defendant's control clearly makes the doctrine inapplicable to the case. (Evid. Code, § 646; see Witkin, Cal. Evidence (2d ed. 1966) § 281, p. 241.)

The boxcar in question had been opened and closed many times prior to its arrival at the Georgia-Pacific's siding, where the accident occurred. Testimony established that wedge bars were commonly provided and used for additional leverage in turning boxcar door handles. The absence of wedge bar use was negated only for the three or four days immediately preceding respondent's injury, while the car was on the Georgia-Pacific siding. The record contains no evidence regarding the

condition or treatment of the boxcar during the approximate four months it was in use throughout the western United States.

Respondent argued at trial that "handles are not supposed to fall off." Without benefit of the res ipsa doctrine, this only comprises argument of proof of negligence by circumstantial evidence.

Respondent asserts on appeal that since appellant is a subsidiary of Southern Pacific, possession of the car by Southern Pacific can be imputed to appellant. At no time during trial did respondent attempt to prove that appellant acted as the alter ego of Southern Pacific. The sole theory at trial was that liability rested on appellant for its acts and omissions, not those of Southern Pacific. As such this 12th-hour change in theory is not cognizable on appeal. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738].)

█ The burden in this case was for respondent to establish by a fair preponderance of competent evidence that the accident causing his injury was occasioned by the defendant's omission to discharge some duty which rested on it. He failed to do so.

Recovery cannot be predicated only on the fact that the accident occurred and the respondent was injured.

The judgment is reversed and the trial court is directed to enter judgment for the defendant, St. Louis Southwestern Railway Company.

Brown (G. A.), P. J., and Franson, J., concurred.