882 F.2d 349
 14 O.S.H. Cas.(BNA) 1155
 Charles V. ELLISON, Plaintiff,
v.
SHELL OIL COMPANY, Third-Party-Defendant-Appellee,
Southern Pacific Transportation Company,
Defendant-Third-Party-Plaintiff-Appellant.
 No. 87-5721.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 11, 1989.
Decided July 31, 1989.
 
 Robert S. Wolfe, David E. Cranston and Theodore D. Levin, Morris, Polich & Purdy, Los Angeles, Cal., for third party plaintiff-appellant.
 Raymond V. McCord, Shell Oil Co., Universal City, Cal., for third party defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE, CANBY and TROTT, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Southern Pacific Transportation Company (Southern Pacific) challenges the district court's directed verdict in favor of Shell Oil Company (Shell). Ellison, an employee of Southern Pacific, filed a personal injury action against Southern Pacific under the Federal Employers' Liability Act (FELA). Southern Pacific then brought a third party complaint seeking comparative indemnity from Shell for its alleged role in causing Ellison's injury. Southern Pacific argues that the district court erred in its conclusions that Shell owed no duty to Ellison and that there was insufficient evidence that Shell breached any duty.
 
 
 2
 The district court had jurisdiction over Ellison's cause of action against Southern Pacific under 28 U.S.C. Sec. 1337(a) and 45 U.S.C. Sec. 56. The district court had ancillary jurisdiction over Southern Pacific's third party claim for indemnity against Shell. United States v. City of Twin Falls, 806 F.2d 862, 866-67 (9th Cir.1986), cert. denied, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987); see also United States v. United Pacific Insurance Co., 472 F.2d 792, 794-95 (9th Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2273, 36 L.Ed.2d 958 (1973). We have jurisdiction over Southern Pacific's timely appeal pursuant to 28 U.S.C. Sec. 1291. We reverse and remand.
 
 
 3
 * The accident occurred on April 27, 1985, at an oil refinery yard owned by Shell in Carson, California (Carson refinery). Ellison, a brakeman employed by Southern Pacific, was part of a Southern Pacific switching crew engaged in "pulling and spotting" liquid petroleum gas railroad tank cars. "Pulling and spotting" is a process in which a switching crew moves designated empty cars from storage tracks to a "loading facility" where they are "spotted" in place for loading.
 
 
 4
 Ellison's duties frequently required him to board moving railroad cars. To board a tank car, Ellison would take hold of a "grab iron" to step onto a stirrup, and then use the grab iron to pull himself onto the catwalk. The accident occurred when Ellison attempted to board tank car SOEX 3230, which was owned and exclusively used by Shell. The grab iron, which was bolted to the ladder leading to the catwalk, gave way when Ellison took hold of it, causing him to fall to the ground and sustain injuries.
 
 
 5
 Examination of the grab iron after the accident revealed that a bolt which attached the grab iron to the ladder was missing. Although the surrounding ground surface was paved with blacktop, this missing bolt was never found. There was conflicting testimony as to whether the bolt "sheared off" when Ellison took hold of the grab iron or whether by then it was already missing.
 
 
 6
 The relationship between Southern Pacific and Shell with respect to this tank car is somewhat difficult to unravel. As already stated, Shell owned and exclusively used the car. Southern Pacific, however, had sole responsibility for moving Shell's railroad cars within, as well as into and out of, the Carson refinery. Shell did not have the personnel or facilities to do this itself. Although Southern Pacific had some discretion over the movement of Shell's cars and could move them without permission, Southern Pacific generally moved cars at Shell's direction.
 
 
 7
 The record reflects that Jewel Taylor, a Shell employee, coordinated the movement of tank cars into and out of the Carson refinery. Maxcimo Nava, a freight carman employed by Southern Pacific, performed maintenance for freight cars in several yards including the Carson refinery. Taylor and Nava had an arrangement whereby Nava would inspect Shell's cars before Southern Pacific "pulled and spotted" the cars at the loading facility. Southern Pacific would notify Taylor as soon as empty tank cars owned by Shell arrived at the Carson refinery or Southern Pacific's Delores storage yard nearby. Taylor would then tell Nava which cars had arrived, and Nava would make a preliminary mechanical inspection of the cars. Nava made no written report of these inspections, but rather would call Taylor and let her know of any defects requiring repair. Taylor would then see that the repairs were made. She would ask Nava if he could fix the problem; if not, he would "bad order" the car and Taylor would arrange for someone else to repair it.
 
 
 8
 This was apparently an informal arrangement. The record discloses no such contract governing (1) the relationship between Shell and Southern Pacific, or (2) the responsibility for inspecting either Shell's cars in general, or car SOEX 3230 in particular. Nava was never paid for these preliminary inspections. Taylor described this procedure as a "courtesy car inspection," and Nava's testimony confirmed that this was an informal accommodation. Aside from this informal arrangement, no formal procedure existed for inspection of cars between their arrival at Shell's yard and the time they were "spotted" at the loading facility. "Normally," Taylor testified, such an inspection "really wasn't done." Although she believed that such inspections were needed to expedite the movement of the cars, Taylor could not recall mentioning this need to her supervisors.
 
 
 9
 Once a car reached the loading facility, two formal inspections would occur. Before loading, Shell personnel would perform a mechanical inspection of the car. After it was loaded, Nava would perform a "Class A inspection." Normally, a car which passed Class A inspection would leave the Carson refinery the same day. Southern Pacific was required under the Safety Appliance Acts to perform such an inspection before the car left the yard and moved onto the railroad line, even if the car was owned by a private shipper such as Shell. 45 U.S.C. Sec. 23.
 
 
 10
 On April 1, 1985, 26 days before the accident, car SOEX 3230 was formally inspected. The car then left the Carson refinery and arrived loaded in Houston on April 7. The car's whereabouts from April 7 to April 15, 1985, are unclear from the record--presumably it stayed in Houston. Starting April 15, Southern Pacific pulled the empty car from Houston to the Carson refinery, where it arrived on April 22. On April 22 and 23, Southern Pacific removed the car from the Carson refinery and then returned it. The car sat idle and empty on storage tracks at the Carson refinery for the next four days until the accident occurred.
 
 
 11
 It is unclear from the record whether the car received a "courtesy inspection" from Nava after it reached the Carson refinery. As mentioned above, no written records were kept of these "courtesy inspections," and Taylor had no notes indicating any problem with the car. After telling Nava which cars needed "courtesy inspections," she heard back from him only when an inspection revealed a problem. If she heard nothing, she assumed that Nava had inspected the cars and found no defects or problems.
 
 
 12
 Ellison brought an action against Southern Pacific under the FELA, 45 U.S.C. Secs. 51-60, alleging violations of the Safety Appliance Acts, 45 U.S.C. Secs. 1-16. The court allowed Southern Pacific to file a third-party action against Shell for indemnity, contribution, and offset. At the conclusion of testimony before a jury, Shell moved for and the district court granted a directed verdict on Southern Pacific's third party claim. Ellison and Southern Pacific then settled the dispute.
 
 II
 
 13
 A directed verdict is reviewed independently; "[t]he court must view the evidence in the light most favorable to the nonmoving party and draw all possible inferences in favor of that party." Donoghue v. County of Orange, 848 F.2d 926, 932 (9th Cir.1987) (Donoghue ). A directed verdict may be upheld only when the evidence permits but one reasonable conclusion as to the verdict. Id.
 
 
 14
 We look to California law to provide the substantive tort law governing Southern Pacific's ancillary claim against Shell. Armstrong v. Kansas City Southern Railway Co., 752 F.2d 1110, 1114 (5th Cir.1985) (Armstrong ) (state law governs FELA defendant's right to seek indemnity); Ratigan v. New York Central Railroad Co., 291 F.2d 548, 553 (2d Cir.) (same), cert. denied, 368 U.S. 891, 82 S.Ct. 144, 7 L.Ed.2d 89 (1961); see Mayview Corp. v. Rodstein, 620 F.2d 1347, 1357 n. 7 (9th Cir.1980). The district court's interpretation of California law is reviewed independently. Hutchinson v. United States, 841 F.2d 966, 967 (9th Cir.1988).
 
 
 15
 As a threshold matter, the parties dispute whether our review should address the grounds stated by the district judge in ruling orally on the directed verdict, or the grounds specified in his written judgment. Southern Pacific observes that not only do these grounds differ significantly, but the written judgment was prepared by counsel for Shell. See Heiniger v. City of Phoenix, 625 F.2d 842, 844 n. 4 (9th Cir.1980) (court must "scrutinize with greater than usual care" findings of fact drafted by one party's counsel and adopted verbatim by the court). However, counsel for Southern Pacific conceded at oral argument that the written judgment reflected the considered judgment of the court. We are aware of no case directing us to review the oral judgment rather than the written judgment. Oral responses from the bench may fail to convey the judge's ultimate evaluation. Subsequent consideration may cause the district judge to modify his or her views. Thus, we will review the written judgment. See United States v. Richardson, 638 F.2d 1189, 1189 (9th Cir.1980).
 
 
 16
 The district court based its directed verdict on two grounds: Southern Pacific failed to produce sufficient evidence either that Shell owed any duty to Ellison, or that Shell breached any duty it might have owed to Ellison. We consider each ground in turn.
 
 III
 
 17
 Under California law, "[t]he question of 'duty' is decided by the court, not the jury." Ballard v. Uribe, 41 Cal.3d 564, 572 n. 6, 715 P.2d 624, 224 Cal.Rptr. 664 (1986) (Ballard ). "Duty is primarily a question of law...." Hedlund v. Superior Court, 34 Cal.3d 695, 705, 669 P.2d 41, 194 Cal.Rptr. 805 (1983) (Hedlund ). A duty is "merely [a] conclusory expression[ ] that, in cases of a particular type, liability should be imposed for damage done." Thompson v. County of Alameda, 27 Cal.3d 741, 750, 614 P.2d 728, 167 Cal.Rptr. 70 (1980), quoting Tarasoff v. Regents of University of California, 17 Cal.3d 425, 434, 551 P.2d 334, 131 Cal.Rptr. 14 (1976). Duty is "only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Ballard, 41 Cal.3d at 572 n. 6, 715 P.2d 624, 224 Cal.Rptr. 664, quoting Dillon v. Legg, 68 Cal.2d 728, 734, 441 P.2d 912, 69 Cal.Rptr. 72 (1968). In California, all persons have a statutory duty "to use ordinary care to prevent others being injured as a result of their conduct." Cal.Civ.Code Sec. 1714. Courts focus on a number of considerations enumerated in Rowland v. Christian, 69 Cal.2d 108, 112-13, 443 P.2d 561, 70 Cal.Rptr. 97 (1968), the foremost of which is the foreseeability of harm to the plaintiff. Ballard, 41 Cal.3d at 572 n. 6, 715 P.2d 624, 224 Cal.Rptr. 664; Hedlund, 34 Cal.3d at 705, 669 P.2d 41, 194 Cal.Rptr. 805. This is not the same foreseeability determination as "whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather ... whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." Ballard, 41 Cal.3d at 573 n. 6, 715 P.2d 624, 224 Cal.Rptr. 664 (emphasis in original).
 
 
 18
 The district court did not inquire into any of these policy considerations or evaluate foreseeability; it did not define the category of allegedly negligent conduct involved here. Rather, the district judge held that Southern Pacific "failed to introduce sufficient evidence to prove that [Shell] had a duty to [Southern Pacific] or [Ellison]." The district court erred in considering duty a factual issue. We now discuss whether such a duty exists as a matter of law.
 
 A.
 
 19
 Shell argues that it could not have had any duty, because Southern Pacific had a nondelegable duty under the FELA and the Safety Appliance Act to (1) inspect cars on its line or in Shell's yard and (2) provide its employees with a safe place to work even on the premises of third parties. Shell's threshold argument, in effect, is that Southern Pacific's duty to its employees under the FELA deprives Southern Pacific of the ability to seek indemnity.
 
 
 20
 The FELA governs the relations between a railroad and its employees, and its "main purpose was to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions." Lewy v. Southern Pacific Transportation Co., 799 F.2d 1281, 1287 (9th Cir.1986). An employee can recover damages under the FELA if the employer's negligence played any part, however slight, in producing his or her injury. Taylor v. Burlington Northern Railroad Co., 787 F.2d 1309, 1313 (9th Cir.1986), citing Rogers v. Missouri Pacific Railroad, 352 U.S. 500, 508, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957). But the FELA does not bar railroads from seeking indemnity where state law permits and where another party bears some legal responsibility. Armstrong, 752 F.2d at 1114. The FELA's purpose of providing recovery for injured workers is not defeated by permitting an employer to recoup its losses in part or in full from a third party, when the circumstances and state law permit. Thus, Southern Pacific's duty under the FELA as to claims by its employees does not automatically negate any duty owed by Shell to either Southern Pacific or its employees. We therefore must examine Southern Pacific's right to indemnity under California law.
 
 B.
 
 21
 In Seeley v. Seymour, 190 Cal.App.3d 844, 237 Cal.Rptr. 282 (1987), a city recorder of deeds had a nondelegable statutory duty, but was allowed to pursue a negligent recordation action against a third party, a title deed recording company. The court held that it was not inconsistent with the city recorder's statutory nondelegable duty for the third party to owe a separate but concurrent duty enforceable by the city recorder. Id. at 863, 237 Cal.Rptr. 282. Here, it is not inconsistent with Southern Pacific's nondelegable FELA duty to Ellison for Shell to owe a separate but concurrent duty enforceable by Southern Pacific.
 
 
 22
 Similarly, California courts have held that comparative indemnity is proper between a strictly liable tortfeasor and a negligent tortfeasor. See Safeway Stores, Inc. v. Nest-Kart, 21 Cal.3d 322, 579 P.2d 441, 146 Cal.Rptr. 550 (1978); see also City of Sacramento v. Gemsch Investment Co., 115 Cal.App.3d 869, 876, 171 Cal.Rptr. 764 (1981) (Gemsch ). Southern Pacific's nondelegable duty to its employee under the FELA should not place Southern Pacific in a worse position than a strictly liable tortfeasor. Therefore, Southern Pacific should be entitled to seek indemnity under California law.
 
 
 23
 California adopted comparative indemnity theory in American Motorcycle Association v. Superior Court, 20 Cal.3d 578, 598, 578 P.2d 899, 146 Cal.Rptr. 182 (1978). Under this theory, a concurrent tortfeasor may "obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." Id. Shell owes partial indemnity under American Motorcycle as long as it bears any portion of fault, however slight. "Whatever the nature of the relative faults, whatever the quantum, it is measurable under [American Motorcycle ]." Gemsch, 115 Cal.App.3d at 876, 171 Cal.Rptr. 764.
 
 
 24
 It is clear that California law accepts the theory that Southern Pacific may seek indemnification from Shell if Shell did owe Ellison a legal duty to make a reasonable inspection of the car before requesting that "pulling and spotting" occur. We now examine whether that duty exists.
 
 C.
 
 25
 In Zancaner v. Louisville & Nashville Railroad Co., 220 Cal.App.2d 836, 34 Cal.Rptr. 143 (1963) (Zancaner ), a railroad employee suffered injuries when the door of a freight car fell upon him as he opened it. Id. at 837-38, 34 Cal.Rptr. 143. One defendant, a railroad, had turned the car over to Zancaner's employer, another railroad defendant. Id. at 838, 34 Cal.Rptr. 143. The court held that even if the later defendant was negligent, that does not excuse the earlier defendant from liability for injuries resulting from its negligence. Id. at 840-41, 34 Cal.Rptr. 143. The earlier defendant owes the later defendant's employees the duty to make a reasonable inspection. Id. at 840, 34 Cal.Rptr. 143.
 
 
 26
 Zancaner suggests that Shell owed such a duty. Although unlike the earlier defendant in Zancaner, Shell is not a railroad, we see no reason not to apply Zancaner 's holding to Shell. Here Shell owned the car in question, and the car had been on Shell's property for four days.
 
 
 27
 In Tierstein v. Licht, 174 Cal.App.2d 835, 345 P.2d 341 (1959), the plaintiff was injured while helping one defendant load a horse into a trailer obtained from a second defendant. Neither defendant had inspected the trailer and it was unclear whether the cause of the injury, a defective tie loop, was ascertainable by inspection. The trailer, which belonged to the bailor, had been in the exclusive possession of the bailee for two months. The court held that where a bailment is for hire or for mutual benefit, a bailor owes several duties to bailees and third parties. Id. at 840-41, 345 P.2d 341. A bailor owes a duty "to warn of actually known defects," and a duty to use reasonable care to examine a chattel to make sure it is safe and suitable for "the use known to be intended." Id. The relationship between Shell and Southern Pacific was undoubtedly for mutual benefit, and Ellison was injured while assisting in the movement of the car, a task clearly "known to be intended" by Shell and Southern Pacific. See 9 Cal.Jur.3d Bailments Sec. 3, at 119-21 (1988) (defining a bailment). Tierstein suggests that by virtue of providing its tank car to Southern Pacific where Southern Pacific employees would be involved, Shell owed Ellison a bailor's duty to use reasonable care to examine the tank car and ensure that it was safe and suitable to be "pulled and spotted." See 174 Cal.App.2d at 840-41, 345 P.2d 341.
 
 
 28
 Similarly, in Zucker v. Passetti Trucking Co., 191 Cal.App.2d 260, 12 Cal.Rptr. 692 (1961), a case involving a compressor that came unhitched from the truck that was towing it, the court held that a bailor owes a duty to bailees and third persons to inspect for defects. Id. at 265, 12 Cal.Rptr. 692. This duty arises not only from the existence of a bailment contract, but from the bailor's duty to refrain from setting loose a dangerous instrumentality. Id.
 
 
 29
 In Garner v. Pacific Electric Railway Co., 202 Cal.App.2d 720, 21 Cal.Rptr. 352 (1962) (Garner ), the court concluded that a railroad has a duty of care to make the cars it delivers for loading and unloading by employees of other companies reasonably safe. Id. at 731-32, 21 Cal.Rptr. 352. Railroads also have a duty to make reasonable inspections of their cars. Id. The court reached this conclusion by comparing the railroad's duty to the duty owed by an invitor to an invitee. Id. at 729, 21 Cal.Rptr. 352. The court explained that although "[o]bvious dangers are charged to the invitee," the invitor owes a duty reasonably to inspect, discover, remove, and warn of "hidden dangers" which must be "discharged with a degree of care commensurate with the danger to be anticipated." Id. "The conditions and circumstances of the particular situation will govern what constitutes a reasonable inspection." Id. at 731, 21 Cal.Rptr. 352. An invitor owes a duty to inspect for dangers caused not only by its own negligence but also by ordinary wear and tear. Id. at 729, 21 Cal.Rptr. 352. Similarly, the court in Mertes v. Atchison, Topeka & Santa Fe Railway Co., 206 Cal.App.2d 64, 23 Cal.Rptr. 320 (1962), held that a railroad's duty of ordinary care in delivering cars reasonably safe for unloading requires it to make reasonable inspections and warn of defects. Id. at 69, 23 Cal.Rptr. 320 (relying on Garner, 202 Cal.App.2d at 731-32, 21 Cal.Rptr. 352).
 
 
 30
 Garner suggests that Shell owed a duty to make an inspection reasonable under the particular conditions and circumstances involved. 202 Cal.App.2d at 731, 21 Cal.Rptr. 352. Similarly, Mertes suggests that Shell owed a duty to make a reasonable inspection of its tank car and warn Southern Pacific and/or Ellison of any defects. 206 Cal.App.2d at 69, 23 Cal.Rptr. 320.
 
 
 31
 Shell contends that its duty to Southern Pacific and Ellison is defined by Dickson v. Southern California Edison Co., 136 Cal.App.2d 85, 288 P.2d 310 (1955). We disagree. In Dickson, a truck's owner rented the truck to the plaintiff's employer 20 months before the accident, and did not thereafter operate, inspect or control the truck. The plaintiff's employer had maintained and repaired the truck itself throughout this period, without ever asking the owner to perform any major repairs as required by the contract. Shell's connection to the tank car is far closer than the Dickson defendant's extremely attenuated connection to the truck.
 
 
 32
 We conclude that the district court erred in determining that Shell owed Southern Pacific and Ellison no duty. Our review of the foregoing cases shows that at a minimum Shell owed Southern Pacific and Ellison a duty to make a reasonable inspection of car SOEX 3230 before furnishing it to be "pulled and spotted." It was sufficiently foreseeable that a railroad employee pulling and spotting a Shell car before it reached the loading facility would be injured by a loose grab iron. See Ballard, 41 Cal.3d at 572 n. 6, 715 P.2d 624, 224 Cal.Rptr. 664; Hedlund, 34 Cal.3d at 705, 669 P.2d 41, 194 Cal.Rptr. 805. At a minimum, therefore, Shell had a duty under California law to make a reasonable inspection of such a car. What constitutes a reasonable inspection is determined by "the standard of care a reasonable and prudent man would exercise under the same or similar circumstances." Zancaner, 220 Cal.App.2d at 840, 34 Cal.Rptr. 143. Once a duty has been established, under California's law of comparative indemnity, Southern Pacific can collect indemnity from Shell for any amount or type of fault that Shell bears, however slight. Gemsch, 115 Cal.App.3d at 876, 171 Cal.Rptr. 764.
 
 IV
 
 33
 Our conclusion that Shell had a duty does not necessarily mean that Shell was liable. It is a separate question whether Shell's actions were sufficient to discharge this duty. The outcome of this case, therefore, hinges on whether we agree with the district court's alternative holding that there was insufficient evidence that Shell breached any duty it may have owed. If a reasonable jury could have reached a contrary conclusion on any theory of negligence offered by Southern Pacific, we must reverse the directed verdict.
 
 
 34
 Pointing to the disappearance of the bolt securing the grab iron, Shell suggests that it is speculative whether the defect that caused the accident was ascertainable. Bergman v. St. Louis Southwestern Railway Co., 134 Cal.App.3d 696, 185 Cal.Rptr. 150 (1982), makes it clear that absent evidence that the required inspection by Shell would have revealed the defect, Shell cannot be held negligent. Id. at 701-04, 185 Cal.Rptr. 150. Viewing the evidence in the light most favorable to Southern Pacific, we believe that a jury could reasonably have concluded that an adequate inspection would have revealed the looseness of the grab iron or the absence of the bolt. After the accident, inspection of the car revealed that several other handles were loose as well. There was conflicting testimony concerning how long the bolt had been missing, and whether, if "sheared off" by Ellison, the bolt should have been found nearby, easily visible on the blacktop. The jury could interpret this testimony in the light most favorable to Southern Pacific.
 
 
 35
 Shell responds that Southern Pacific, not Shell, had control of the car, and that it was mere happenstance that the car sat in the Carson refinery rather than Southern Pacific's own Delores yard. Shell further suggests that the informal arrangement between Taylor and Nava for Nava's "courtesy inspections" was sufficient to satisfy Shell's duty. Shell argues that Nava acted as an agent of Southern Pacific. Viewed in the light most favorable to Southern Pacific, the record does not compel Shell's conclusions. The jury could reasonably have found that Shell directed the movement of its cars, and that the "courtesy inspections" did not meet the standard of what a reasonable and prudent person in Shell's position would have done. The jury could have found that, in this informal arrangement, Nava acted as an agent of Shell rather than Southern Pacific.
 
 
 36
 We need not choose among Southern Pacific's theories of Shell's negligence. It is sufficient to say that we cannot agree with the district court's conclusion that the evidence here permits only one reasonable conclusion as to the verdict. See Donoghue, 848 F.2d at 932. At this point it is for a jury to determine what a reasonable and prudent person in Shell's position would have done, whether Shell in fact did that, whether the defect was ascertainable through Shell's performance of its duty, and whether any negligence of Shell was a proximate cause of Ellison's injury.
 
 
 37
 REVERSED AND REMANDED.